**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

**Civil Action No. [ ]**

DANIEL W. PLUTT, individually;

      Plaintiff,

v.

ARMOR CORRECTIONAL HEALTH SERVICES, INC.;
WELLPATH LLC;
EL PASO COUNTY, COLORADO;
BOARD OF COUNTY COMMISSIONERS, EL PASO COUNTY;
SHERIFF BILL ELDER, in his official capacity;
KATHLEEN SYLTE, individually;
AMANDA HUTCHINSON, individually;
HUNTER GRANT, individually;
ROBERT PERO, individually;
SAMUEL COFIELD, individually;
JOSEPH FELDMAN, individually;
DAVID WHITAKER, individually;
DENISE HOLLOWAY, individually; and
Jane and John Does 1-10,

      Defendants.

_____

**COMPLAINT AND JURY DEMAND**
_____

      Plaintiff, Daniel Plutt, by and through his attorneys of Stimson Stancil LaBranche Hubbard, LLC, complains against Defendants and requests a trial by jury as follows:

## I. <u>INTRODUCTION</u>

      1.    Daniel Plutt was an inmate at the El Paso County Jail when he began suffering from an untreated infection below his knee at the site of a recent amputation. Despite Mr. Plutt's efforts to obtain medical treatment, the Defendants ignored the infection and its symptoms for days.

During this time, the infection spread and grew worse. Mr. Plutt suffered intense pain and largely lost his ability to walk. After spending more than a week seeking medical attention, Mr. Plutt was provided antibiotics, but no further treatment.

2.     Over the course of multiple days, Mr. Plutt's symptoms subsided, but the infection came roaring back not long after he was taken off antibiotics. Again, Mr. Plutt suffered for over a week as Defendants knowingly disregarded his worsening symptoms. They watched him grow sick. They watched the sores on his leg proliferate, ooze, and spread. They watched him lose his ability to walk. They gave him a wheelchair, but they did not treat the infection. Mr. Plutt was suffering from an acute methicillin resistant staphylococcus aureus (MRSA) infection, but jail staff and healthcare workers ignored, again and again, his life-threatening symptoms.

3.     In just the nick of time, Mr. Plutt received a court-ordered furlough to leave the jail for medical help. By the time he was finally hospitalized, Mr. Plutt was tachycardic, hypertensive, in acute pain, and at risk of losing more of his leg, if not his life, to the infection. Hospital workers quickly identified the danger and sent him to the emergency room. Doctors cleaned and drained the pustules, prescribed fentanyl for the pain, and administered intravenous antibiotics. It took days to nurse him back from the brink. Only by miraculous and long overdue intervention was Mr. Plutt's life spared.

4.     The Defendants' actions caused Mr. Plutt extraordinary and wholly avoidable pain and suffering and deprived him of rights secured by the United States Constitution and the laws of the State of Colorado and the United States of America.

## II.  <u>JURISDICTION AND VENUE</u>

5.     This action arises under the Constitution and laws of the United States, including

42 U.S.C. § 1983; 42 U.S.C. § 1988; the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101, *et. seq.*, as amended; and Section 504 of the Rehabilitation Act of 1973 (Section 504), 29 U.S.C. § 701, *et. seq.* The Jurisdiction of this Court is further invoked pursuant to 28 U.S.C. §§ 1331, 1343, 2201.

6.      This Court has personal jurisdiction over all the named Defendants because they either reside in or conduct systematic and continuous business within the State of Colorado. Moreover, Defendants interacted with one another and Plaintiff while operating under the terms of commercial contracts, the material terms and performance of which occurred in whole or in part in the State of Colorado; and Defendants' contacts with the State of Colorado were purposeful and deliberate.

7.      Venue is proper in this jurisdiction under 28 U.S.C. § 1391(b) because all the events and/or omissions giving rise to the claims contained in this Complaint occurred within the State of Colorado.

8.      Supplemental pendent jurisdiction is based on 28 U.S.C. § 1367 because the violations of federal law alleged are substantial and the pendent causes of action derive from a common nucleus of operative facts.

9.      The state law claims in this matter are brought against private corporations and therefore no notice of claims was required under the Colorado Governmental Immunity Act ("CGIA").

### III.  PARTIES

*Plaintiff*

10.     At all times relevant hereto, Plaintiff Daniel Plutt was a resident of the State of

Colorado and a citizen of the United States of America.

***El Paso County Defendants***

11.     The Defendant Board of County Commissioners, El Paso County ("BOCC"), is a governmental entity chartered under the laws of the State of Colorado. Among other things, El Paso County, through the El Paso County Sheriff's Office ("Sheriff"), operates the El Paso County Criminal Justice Center ("CJC" or "the jail"), located at 2739 E. Las Vegas St., Colorado Springs, Colorado 80906.

12.     The Defendant BOCC represents, oversees, and sets policy for El Paso County Colorado. The BOCC contracted with Defendant Armor Correctional Health Services, Inc. to provide healthcare to the inmates at the jail. When this contract terminated, the BOCC contracted with Defendant Wellpath LLC to provide healthcare to the inmates at the jail.

13.     Defendant Bill Elder, in his official capacity, is the El Paso County Sheriff and is a final policy maker for El Paso County with respect to all matters concerning the Sheriff's Office and all its divisions, including CJC. Sheriff Elder was responsible for training and/or supervising all other Defendants outside BOCC and all other employees of the El Paso County Sheriff's Office working at the jail, and for ensuring the health and welfare of all persons held at CJC.

14.     The El Paso County Sheriff and BOCC are collectively referred to herein as "El Paso County," "El Paso County Defendants," or "the County."

15.     Although the County has sought to privatize the provision of healthcare services to its population of pre-trial detainees and post-conviction inmates, it has a non-delegable duty to provide constitutionally adequate care, cannot contract away its constitutional obligation, and is legally liable for the challenged deliberately indifferent polices and practices and for the

deliberately indifferent medical care and treatment of persons held in the CJC, including Plaintiff, by its contractors, their agents and employees.

***Corporate Defendants***

16.     The intent of the next paragraph is to identify all corporate entities with which El Paso County contracted to provide medical care to the inmates at the jail during the period in question.

17.     Defendant Armor Correctional Health Services, Inc. ("Armor") is a private Florida corporation doing business in the state of Colorado with its principal address located at 4960 SW 72nd Ave., Ste. 400, Miami, Florida, and its registered agent in Colorado, CT Corporation System, located at 7700 E. Arapahoe Rd., Ste. 220, Centennial, CO.

18.     From July 15, 2017, or earlier, through December 31, 2019, Armor contracted with El Paso County to provide medical services to its inmates and supervise and implement such care. Upon entering into contracts or subcontracts to provide medical and/or other services to El Paso County inmates, Armor assumed public functions, acted under color of state law, and is legally responsible for complying with all requirements of the United States Constitution.

19.     Defendant Armor is a proper entity to be sued under 42 U.S.C. § 1983 for its deliberately indifferent policies, practices, habits, customs, procedures, and training and supervision of staff, including individual Defendants, with respect to the provision of medical care and treatment for inmates.

20.     Defendant Armor is also properly sued for its own negligence and the negligence of its agents and employees under state law. Defendant Armor is vicariously liable for the acts and omissions of its medical workers and agents.

21.     Defendant Wellpath is a private Tennessee corporation doing business in the state of Colorado with its headquarters at 1283 Murfreesboro Road, Nashville, Tennessee and its registered agent in Colorado, Corporate Creations Network Inc., located at 155 E. Boardwalk #490 in Fort Collins, Colorado. Wellpath is the product of a recent merger between Correct Care Solutions, LLC (CCS), and another private healthcare provider. Upon information and belief, Wellpath is the successor in interest to CCS.

22.     Since January 1, 2020, Defendant Wellpath has contracted with El Paso County to provide medical services to its inmates and supervises and implements such care. Upon entering into contracts or subcontracts to provide medical and/or other services to El Paso County inmates, Wellpath assumed public functions, acted under color of state law, and is legally responsible for complying with all requirements of the United States Constitution.

23.     Defendant Wellpath is a proper entity to be sued under 42 U.S.C. § 1983 for its deliberately indifferent policies, practices, habits, customs, procedures, and training and supervision of staff, including individual Defendants, with respect to the provision of medical care and treatment for inmates.

24.     Defendant Wellpath is also properly sued for its own negligence and the negligence of its agents and employees under state law. Defendant Wellpath is vicariously liable for the acts and omissions of its medical workers and agents.

25.     Armor and Wellpath are collectively referred to as the "Corporate Defendants."

26.     El Paso County Defendants and Corporate Defendants are collectively referred to as the "Entity Defendants."

***Individual Defendants***

### Medical Providers

27.     At all relevant times, Defendant Kathleen Sylte, RN, was a citizen of the United States and a resident of Colorado. Defendant Sylte was an agent, employee, and/or subcontractor of Defendant Armor and Defendant Wellpath and was responsible for providing medical care to Plaintiff during his detention. At all material times, this Defendant was acting under color of state law.

28.     At all relevant times, Defendant Amanda Hutchinson, Clinician,[1] was a citizen of the United States and a resident of Colorado. Defendant Hutchinson was an agent, employee, and/or subcontractor of Defendant Armor and Defendant Wellpath and was responsible for providing medical care to Plaintiff during his detention. At all material times, this Defendant was acting under color of state law.

29.     At all relevant times, Defendant Hunter Grant, RN, was a citizen of the United States and a resident of Colorado. Defendant Grant was an agent, employee, and/or subcontractor of Defendant Armor and Defendant Wellpath and was responsible for providing medical care to Plaintiff during his detention. At all material times, this Defendant was acting under color of state law.

30.     At all relevant times, Defendant Robert Pero, MD, was a citizen of the United States and a resident of Colorado. Defendant Pero was an agent, employee, and/or subcontractor of Defendant Armor and Defendant Wellpath and was responsible for providing medical care to

---

[1] Ms. Hutchinson's medical credentials are not clear from the records available.

Plaintiff during his detention. At all material times, this Defendant was acting under color of state law.

31.     Defendants Sylte, Hutchinson, Grant, and Pero, are referred to as "Individual Medical Provider Defendants."

**CJC Staff**

32.     At all relevant times, Defendant Samuel Cofield was a citizen of the United States and a resident of Colorado and an agent and/or employee of El Paso County, working as a Deputy with the El Paso County Sheriff's Office at CJC and acting under color of state law.

33.     At all relevant times, Defendant David Whitaker was a citizen of the United States and a resident of Colorado and an agent and/or employee of El Paso County, working as a Deputy with the El Paso County Sheriff's Office at CJC and acting under color of state law.

34.     At all relevant times, Defendant Joseph Feldman was a citizen of the United States and a resident of Colorado and an agent and/or employee of El Paso County, working as a Deputy with the El Paso County Sheriff's Office at CJC and acting under color of state law.

35.     At all relevant times, Defendant Denise Holloway was a citizen of the United States and a resident of Colorado and an agent and/or employee of El Paso County, working as an employee or contractor with the El Paso County Sheriff's Office at CJC and acting under color of state law.

36.     Defendants Cofield, Whitaker, Feldman, and Holloway are referred to herein as the "CJC Staff Defendants."  CJC Staff Defendants and Individual Medical Provider Defendants are collectively referred to as "Individual Defendants."

**Unknown Defendants to be Named**

37.     Plaintiff conducted a diligent search prior to filing this Complaint. However, on information and belief, there are former and current employees of El Paso County and the Corporate Defendants whose identities are currently unavailable to him. As a result, Plaintiff will timely amend this complaint during the course of this litigation as he discovers additional proper defendants. Plaintiff has therefore named John and Jane Does 1-10 as defendants in this action.

## IV.   STATEMENT OF FACTS

38.     For purposes of this Complaint, "health care workers" includes Emergency Medical Technicians ("EMT"), Registered Nurses ("RN"), Licensed Practical Nurses ("LPN"), Nurse Practitioners ("NP"), Physicians' Assistants ("PA"), and doctors. "Health care providers," as used herein, includes NPs, PAs, and doctors.

39.     Mr. Plutt was incarcerated at CJC on November 11, 2019. From day one, CJC staff and health care workers knew that Mr. Plutt's leg had recently been amputated below the knee and that failure to provide reasonable accommodations and prompt medical attention could cause him serious injury or worse.

40.     It is a common and recurring need in all jails that inmates whose medical condition is deteriorating be transported in a timely fashion to hospitals for higher level assessment and higher level medical care.

41.     Evaluating and addressing the needs of inmates with severe pain, loss of the ability to walk with a prosthetic, signs of infection, and associated medical conditions, even if only to escalate the matter, is a usual and recurring task for health care and detention workers at CJC.

42.     All reasonable health care workers are aware that staph, MRSA, and other

infections can cause serious injury and death if untreated. Patients like Mr. Plutt with a recent limb amputation are well known to health care workers as high risk for infection at the wound site. All reasonable health care workers are aware that inmates with abscesses, lesions, or pustules at a wound site that are inflamed, changing color, swollen, painful, hot to the touch, emitting fluid, growing, or spreading require more than topical cleanser or antibiotic ointment. All reasonable health care workers know that abscesses, lesions, or pustules at a wound site that are inflamed, changing color, swollen, painful, hot to the touch, emitting fluid, growing, or spreading are emergency symptoms. All reasonable healthcare workers know that symptoms like those exhibited by Mr. Plutt need higher level evaluation and treatment than can be provided in the jail.

43.     In fact, any reasonable lay person knows that abscesses, lesions, or pustules at a wound site that are inflamed, changing color, swollen, painful, hot to the touch, emitting fluid, growing, or spreading are emergency symptoms that require prompt medical treatment.

44.     It is outside the scope and practice of EMTs and nurses to diagnose or determine the cause of signs and symptoms. EMTs and nurses have a duty to convey any abnormal signs, symptoms or vitals to a provider who can diagnose the cause of the abnormalities. All health care workers know that failure to communicate abnormal findings to a provider can cause serious injury or death.

45.     When Mr. Plutt arrived at CJC, he underwent a medical intake evaluation. The provider noted in Mr. Plutt's records the recent amputation, the difficulties it presented for getting around, and the special needs it presented. These special needs included that Mr. Plutt be housed on the bottom tier so that he did not have to use stairs.

46.     Despite Mr. Plutt's clear need for ADA-compliant facilities, the facilities in which

10

he was housed were never ADA-compliant. In many areas, there were no ramps or elevators. Mr. Plutt was forced to navigate steep sets of stairs to attend counseling and access services to which he was entitled. For weeks, he was denied the opportunity to participate in work programs because he is an amputee who walks with a prosthetic. The showers had no handrails. He was not provided with a shower chair.

47.     Beginning on December 22, 2019, or earlier, red bumps appeared on and around the amputation site. Some of the red bumps were visibly filled with purulent material, or "puss." Mr. Plutt feared that the amputation site might be infected or that it might become infected. He asked Deputy Cofield, Deputy Whitaker, Deputy Feldman and other CJC staff to take him to medical on multiple occasions, but he was denied each time.

48.     After being denied multiple times, Mr. Plutt submitted a kite requesting medical attention because "I have a below the knee amput[ation] and have caught a rash that now looks infected and need[s] to be seen ASAP please and thank u."

49.     On December 23, 2019, he told CJC staff again about his condition, and staff responded that they were going to take him to the on-site doctor that night. They never did. The jail denied him medical attention again on December 24th.

50.     While the jail ignored Mr. Plutt's requests for medical attention, his condition grew worse. The number of pustules grew. They became inflamed. One pustule swelled considerably and filled with puss. The condition was extremely painful.

51.     Days after he first sought medical attention and submitted the kite, on December 25, 2019, Defendant Hutchinson replied to the kite that Mr. Plutt had been "scheduled with wound care to assess the wound." Mr. Plutt was taken from his housing area to the medical area. He waited

in a holding area for more than four hours. During this time, individuals waiting in the holding area with him, often less than an arms' length away, vomited, expelled mucus, and bled openly. Mr. Plutt eventually grew too exhausted to remain and returned to his unit. Defendant Sylte documented that patient refused wound care in the ward.

52.     Mr. Plutt again received no medical attention on the 26th. During this time when Mr. Plutt was repeatedly seeking treatment, CJC staff regularly told him that no doctor was available at that time, despite the fact that policies in effect at the jail required the on-site presence of a doctor at all times.

53.     By the time he was finally taken to medical on December 27, 2019, one of the pustules had swelled to the size of a golf ball — a solid white center surrounded by red inflammation — and others were growing as well. Even Mr. Plutt, with no medical training, knew the leg was infected and was deeply concerned that he had a staph infection. According to CJC records, Defendant Sylte conducted a wound assessment and concluded that the wound had not resolved and would require continued attention. Despite the severity of Mr. Plutt's symptoms, she further noted it was a "possible pressure wound." She then applied a topical cleanser and ointment.

54.     Mr. Plutt also saw a doctor on December 27, and the doctor told Mr. Plutt that he was not certified to touch Mr. Plutt's leg. Mr. Plutt was told he would be returned to wound care the following night, and then he was sent back to his holding cell without any further treatment.

55.     Mr. Plutt's condition continued to deteriorate. He grew sweaty and feverish, the pain worsened, and the inspection spread visibly over the wound site. The abscesses multiplied. One of them spread to the size of a half dollar. Mr. Plutt worried that he might lose more of his leg due to the infection.

56.     On December 28, 2019, Defendant Hutchinson assessed his leg. Despite the severe and worsening symptoms, she noted only "R/O ingrown hair vs insect bite." And though no reasonable person, much less a medical professional, responds to ingrown hairs or insect bites in this manner, she then applied topical cleanser and ointment. She advised Mr. Plutt to "return to medical if red bumps spread or open."

57.     Then, on December 29, 2019, a full week after Mr. Plutt first advised CJC and medical staff of the infection, Defendant Grant ordered him a course of antibiotics. Mr. Plutt was returned to his holding area without further treatment. Despite the severe infection, CJC medical staff did not obtain lab cultures. CJC medical staff did not unroof or disinfect the wounds. They did not provide painkilling medication. Mr. Plutt was left to hope the antibiotic would help.

58.     In the following days, Mr. Plutt was extremely ill, suffering from vomiting and acute pain in his leg as it continued to ooze and drain. During this time, a golf ball-sized lump fell from one of the abscesses. Despite the tremendous pain and lack of further medical attention, Mr. Plutt persevered, and the abscesses subsided.

59.     On January 15, 2020, he returned to medical for the first time in over two weeks. Medical reported that the wound was healing appropriately and cleared him to work.

60.     By January 23, 2020, however, the infection had returned, and sores were visible on and around the amputation site.

61.     Mr. Plutt asked CJC staff for a visit to medical. He was denied. He submitted a kite requesting medical assistance. He never received a response.

62.     Mr. Plutt continued to ask for help. He showed jail staff his leg and warned that he could lose more of his leg if the infection wasn't treated. By January 25, 2020, he could barely

walk. Deputy Cofield told Mr. Plutt that he was scheduled for medical, but that Deputy Cofield did not know when it would happen.

63.     Over the course of the next four days, the pain mounted as the infection spread and grew worse. By January 26, 2020, the abscesses were fire red and throbbed with pain. They were hot to the touch. The largest abscess had grown into a large red circle with a discolored and oozing center. Mr. Plutt reported to his family that he was as sick as a dog. He was terrified that he had staph or MRSA and that he would lose more of his leg.

64.     Screen shots from video calls between Mr. Plutt and his family that same day are telling:





65.     By the 27th of January, the muscles in his leg had grown tight, his leg shook, and he could hardly move it. More abscesses developed and the pain grew even worse. On the 28th, Defendants Feldman and Holloway brought Mr. Plutt a wheelchair because he could no longer walk, but they did not get him any medical attention. Mr. Plutt reported to his family that the abscesses were spreading like wildfire.

66.     During this time, Mr. Plutt did everything in his power to obtain treatment. He sent at least five kites. He pleaded with members of CJC staff, including Deputy Cofield, Deputy Whitaker, and Deputy Feldman. He showed them the lesions on his leg. They watched as he lost the ability to walk. Mr. Plutt spent hours in the holding cell outside medical, waiting to be seen. When he was seen by CJC medical staff, he showed them the abscesses and described his symptoms, but CJC medical staff did nothing more than apply topical spray and a band-aid. This occurred with Defendant Sylte, Defendant Hutchinson, and other members of the CJC medical

staff.

67.     On the morning of January 29, 2020, Mr. Plutt was seen again in medical. Defendant Hutchinson noted that there were "[m]ultiple red, swollen, warm abscesses above [the] amputation site." Defendant Pero prescribed antibiotics. But CJC medical staff took no lab cultures. They did not unroof or disinfect the wounds. Mr. Plutt was returned to his holding area.

68.     That same day, Mr. Plutt received a court-ordered furlough to receive medical help. Mr. Plutt's father came to the jail to pick up Mr. Plutt. Mr. Plutt propelled himself in his wheelchair from his holding area to the CJC's intake/outtake area. The CJC staff member working in outtake told Mr. Plutt that he could not leave with the wheelchair. Mr. Plutt pleaded that he only needed it to get down the hall, out of the facility, and to his father's car. The CJC staff member refused.

69.     Mr. Plutt had long since lost the ability to fit his swollen knee into his prosthetic. Denied the use of a wheelchair, and in a weakened and life-threatening state, he was forced to summon every last reserve of strength and hop on one leg out of the facility.

70.     Mr. Plutt got out not a moment too soon. His father drove him straight to UC Health. Upon intake, doctors sent him immediately to the emergency room because he was at risk of sepsis.

71.     In the emergency department, doctors quickly administered critical care to stabilize Mr. Plutt's condition. Critical care is administered when one or more of the patient's organs is failing or at risk of failing. UC Health medical staff concluded it was clear that he had some type of severe infection. Possibilities included "septic joint, abscess, cellulitis, sepsis, osteomyelitis." Given this, they ordered lab cultures right away. Operations were performed to "unroof" the pustules, which  released "copious amounts of purulent discharge." UC Health medical staff then irrigated and debrided the wounds, packed them with iodoform gauze, and dressed them. They

prescribed and administered IV antibiotics. They gave Mr. Plutt fentanyl for the pain.

72.     Given the seriousness of the infection and the risk to Mr. Plutt, he stayed several days in the ICU at the hospital. Hospital staff continued to unroof, clean, disinfect, and dress the wounds. He continued to receive antibiotics. Given the acute pain, he received additional pain relievers, including oxycodone. Gradually, he recovered.

73.     Ultimately, the lab cultures revealed that Mr. Plutt had been infected with MRSA. Without the aggressive, multi-day inpatient treatment he received, the infection likely would have killed him.

74.     Mr. Plutt continues to suffer from complications related to the infection, and the financial costs of those complications, to this day.

**Allegations Relating to *Monell* Liability**

75.     From the time Mr. Plutt was first confined at CJC through December 31, 2019, the County contracted with Armor to provide medical personnel and medical care and services to detainees at CJC.

76.     Beginning on January 1, 2020, the County contracted with Wellpath to provide medical care and services to detainees at CJC. Wellpath took over the duties of Armor, and the medical personnel at CJC, at least as relevant here, did not change as a result of the switch from Armor to Wellpath.

77.     The El Paso County Defendants, Armor, and Wellpath maintained constitutionally deficient policies and failed to adequately train and supervise their employees with respect to proper procedures for the evaluation and treatment of CJC detainees' and inmates' serious medical needs.

78.     It was well known by Entity Defendants prior to Mr. Plutt's infections and resulting complications and suffering that there was a widespread pattern and practice of deliberately indifferent medical care at the CJC, other Armor facilities, and other Wellpath facilities.

79.     The County awarded its medical contract to Armor on July 15, 2017 despite knowing Armor was then a defendant in over 100 pending lawsuits alleging the company provided inadequate medical care to inmates, and that Armor had just been banned from bidding on any contracts in the state of New York following a spate of preventable deaths in an Armor facility.

80.     In the six years preceding the El Paso County contract award, Armor had settled at least 35 separate cases wherein detainees and inmates alleged delays in medical care; inappropriate medication management, medical, and dental care; medical malpractice; and deliberate indifference to serious medical needs. The County knew Armor would not make constitutionally adequate screening or medical decisions and was deliberately indifferent to the predictable consequences.

81.     The County awarded its medical contract to Wellpath on January 1, 2020 despite knowing that Wellpath had been sued over 50 times in recent years for failures leading to serious injury and death of inmates and pretrial detainees. The County knew Wellpath would not make constitutionally adequate screening or medical decisions and was deliberately indifferent to the predictable consequences.

82.     Each of the Individual CJC Staff Defendants violated Mr. Plutt's Eighth Amendment right to be free from deliberate indifference to his medical needs in essentially the same unconstitutional manner — failing to refer him to immediate medical care despite needs so obvious that even a lay person would recognize the necessity of immediate medical attention while

knowing that this failure created significant risk of illness or death. Similarly, each of the Individual Medical Provider Defendants violated Mr. Plutt's Eighth Amendment right to be free from deliberate indifference to his medical needs in essentially the same unconstitutional manner — failing to adequately treat his significant medical problems, ignoring life-threatening symptoms, and failing to refer him for higher level evaluation and treatment despite knowing that failing to do so put him at significant risk of serious illness or death. This pattern, standing alone, evinces the Entity Defendants' custom, policy, or practice of deliberate indifference. *See, e.g.*, *Davies v. Israel*, 342 F. Supp. 3d 1308 (S.D. Fla. 2018) (In another deliberate indifference case involving Armor the court, in denying motions to dismiss, noted: "Plaintiff alleges that each Defendant played a different role in tending to Plaintiff when he was unconscious and bleeding but nonetheless disregarded that serious risk by failing to facilitate Plaintiff's immediate emergency transfer to a hospital by, for example, calling 911. In this way, Defendants each participated in delaying necessary treatment for no apparent medical reason, which may constitute deliberate indifference."); *Watts v. Reynolds*, No. 2:19-CV-25-TLS-JEM, 2019 WL 5294525, at *5 (N.D. Ind. Oct. 17, 2019) (In another deliberate indifference case involving Wellpath, the court held that the plaintiff had made sufficient allegations to support *Monell* liability when the plaintiff claimed "that (1) he suffered injuries . . . and Wellpath and jail employees continuously did nothing to address his injuries; (2) Wellpath and jail personnel denied him his prescribed medication; (3) Wellpath and jail personnel denied medical care relating to his preexisting medical conditions, and "continuously ignored" the Plaintiff's medical complaints; (4) the Plaintiff filed a grievance regarding his medical situation; and (5) Wellpath and jail medical personnel, on at least two occasions, acknowledged his need for medical care but advised him that there was nothing they

would do.").

### The County and Armor

83.     The El Paso County Defendants' and Armor's custom, policy, or practice of deliberate indifference and their lack of adequate training, supervision, and discipline regarding assessing and treating the serious medical needs of those in custody at CJC is further evidenced by the following incidents.

84.     In an October 2, 2017 Notice of Concern to Armor, the County notified Armor that it was not complying with basic requirements of its contract, including "provid[ing] a system of support to the on-site personnel," "supervising and monitoring the program," "operat[ing] the program at full staffing and us[ing] only qualified licensed, certified and professionally trained personnel," "provid[ing] adequate personnel for all shifts," and providing "on-site medical services staff [who] are trained and equipped to respond to an emergency or need for immediate medical and dental services 24-hours a day, 7 days a week." The County concluded that Armor's medical staff's performance "was below required standards."

85.     Despite being put on notice of their substandard performance, not ten days later, on October 11, 2017, CJC inmate Madelyn Taylor Hemphill was forced to give birth into an isolation cell toilet after her calls for medical attention went ignored. Ms. Hemphill's baby inhaled toilet water and stopped breathing. After the baby was resuscitated, she developed an e-coli infection and was in the hospital for three months. Just a day before the birth, EPSO officials met with Armor representatives to discuss a backlog of requests that had left more than 300 inmates without access to prompt medical care.

86.     By December 15, 2017, the National Commission on Correctional Health Care

(NCCHC) placed the CJC on probation. The CJC and Armor had failed seven of 39 "essential standards" including: initial health assessments, oral care, nonemergency health care requests and services, emergency services, continuity and coordination of care during incarceration, suicide prevention and health records.

87.     The CJC and Armor also failed to meet three "important standards" including: clinical performance enhancement, which considers the appropriateness of services delivered by patient care clinicians, orientation for health staff, and nursing assessment protocols, which are guidelines nurses use to perform numerous duties, including administration of prescription medications.

88.     In mid-2018, about a year into the new contract, the County again notified Armor of deficiencies in their care of an inmate with "large open wounds." The County had determined that the patient needed to be taken to an area hospital, and that Armor staff had failed, just like it did with Mr. Plutt, to refer him for transport.

89.     In August 2018, CJC and Armor staff again ignored an inmate's obvious medical needs. Deramus Lemuel arrived at CJC obviously intoxicated and substantially impaired from methamphetamine poisoning. He was handcuffed and unable to walk independently. Nonetheless, multiple CJC officers piled on Mr. Lemuel for more than ten minutes until he had been rendered motionless. An Armor nurse entered the cell and checked Mr. Lemuel's restraints rather than investigate why he had stopped moving. More time passed before jail staff noticed Mr. Lemuel was unresponsive and not breathing. Despite knowing Mr. Lemuel had stopped breathing and detecting only a very weak pulse, the Armor nurse failed to promptly provide him with any medical assistance or call an ambulance. Mr. Lemuel lay unconscious on the ground for at least three

minutes before jail staff finally started performing chest compressions (CPR). Mr. Lemuel never regained consciousness and died two weeks later.

90.     Terry West died from a treatable condition when his cries for help went unanswered and objective indicia of an emergent medical crisis were disregarded. Mr. West had developed a gastric ulcer – a condition routinely treated with over-the-counter medicine. Two days prior to his death Mr. West complained to an Armor nurse that he was having chest pains. The nurse disregarded Mr. West's serious medical complaint and told him he just needed to stretch. The next day an inmate attempted to report to Armor staff that he saw black stool in the toilet while aiding Mr. West in the restroom, but Armor staff instructed the inmate to leave, so he told a CJC deputy instead. In the hours leading up to his death Mr. West screamed for help to an Armor nurse in the area performing med pass. A CJC deputy reported to medical staff that Mr. West had vomited blood. The Armor nurse just walked away. Mr. West died on June 27, 2019, at 57 years old, because a gastric ulcer went untreated, eroded the wall of his stomach, and hemorrhaged.

91.     Also, in 2019, Joseph Lee Martinez rapidly decompensated and reported having delusional thoughts when he went more than three weeks without getting his prescription medications at the CJC. In ordering a competency evaluation, Judge Robin Chittum commented, "this has been a common problem," and ordered Armor to produce records showing Mr. Martinez received his medications "at the right time, every time."

92.     Just months earlier Judge Chittum had ordered Armor to do the same for another patient in their care at CJC, James Edward Papol. Mr. Papol went without his prescribed medications for schizophrenia and bipolar disorder for days, and on at least one occasion for more than a week. Mr. Papol's mental state had declined so severely from Armor's inconsistent

administration of his antipsychotic medications that he had to be taken to the state hospital.

93.     Too late for the many victims of Armor's constitutionally deficient care, Defendant El Paso County notified Armor on April 3, 2019, that Armor had failed to satisfy numerous contract requirements, "warranting an immediate and strong action by Armor to cure multiple deficiencies."

94.     Specific deficiencies cited in the notice included, among others, "alarming" staffing deficiencies that put "the welfare of Armor's incarcerated patients . . . in jeopardy." The El Paso County Sheriff's Office reviewed thirty weekdays in 2019 and found that on average six Armor staff members were absent each day, and that "as many as 11 staff members have been absent on some dates."

95.     Mr. Plutt's case makes clear that, despite this warning, Armor continued to provide constitutionally deficient care.

96.     As detailed below, it was well known at the time El Paso County hired Armor that the for-profit medical provider has a custom, practice, and policy of understaffing its medical units, and that such staffing shortages often result in constitutionally inadequate medical care for inmates in Armor facilities.

97.     The April 3, 2019 notice emphasized that "Armor's failure to meet contract standards governing provision of general medical services, mental health services, and pharmacy services" and its "actions/inactions . . . unnecessarily subject the County's inmates to significant physical and psychological danger and subject the County & Armor to substantial civil liability due to the non-delegable obligation to provide medical care for its inmates."

98.     The County further charged that Armor's policies and customs have delayed critical

care for inmates during emergencies, led to a series of Hepatitis A infections, and left at least one inmate without prescribed medications for ten days.

99.     In June 2019, Armor informed the County it was terminating the CJC contract due to irreversible damage of the parties' relationship, and that Armor would stop providing medical services at CJC at the end of the year. Sheriff Elder, facing mounting claims of substandard medical care, agreed with Armor's decision, saying he had already decided to end the deal with Armor before receiving the letter: "If they want to send the letter and draw the line that says that they're not going to renew the contract, that's their story. . . . Suffice it to say, [the contract] would not have been renewed either way."

100.    It was also well known at the time the County hired Armor that the for-profit medical provider has a custom, practice, and policy of disregarding and minimizing inmates' medical complaints, depriving their patients of prescription medications, and failing to order diagnostic testing and timely send patients to the hospital in order to save money.

101.    In contracts all over the country Armor agrees to cover all costs, up to a limit, for detainees who require diagnostic testing or outside medical services, including hospitalization and specialized treatment for serious illnesses and medical emergencies.

102.    It appears from Armor's proposal for the CJC contract that Armor's customary financial arrangement was also in place at the CJC:



**El Paso County, Colorado**
**Inmate Medical Services**
RFP No.: 17-003
February 13, 2017

Armor acknowledges its responsibility to pay for hospital care and to track private pay resources for reimbursement to County, as well as screening invoices and providing utilization management services.

103.   The requirement that Armor pay for outside medical services, including hospitalization, provides a strong financial incentive not to send seriously ill patients to an outside health care provider.

104.   Indeed, former Armor employees have testified that Armor has a pattern of delaying sending inmates to the hospital and outside specialists in order to increase profits, and that allegation has found backing in several audits of Armor.

105.   Carolyn Rubin, a Registered Nurse who was fired from her job with Armor testified in a deposition that "there was a strong corporate push for the doctor not to send patients out due to money. . . . It was our duty to keep them there as long as possible, to prevent costs of the hospital, plus pulling deputies out of the jail that have to go sit with the patient at the hospital." *See* Rubin Deposition Transcript at 128, *Ibarra v. Armor Correctional Health Services, Inc., et al*., No. 14-cv-00084-EAK-MAP (M.D. Fla. 2014), ECF. No. 36.

106.   According to a former counselor at CJC, inmates at CJC during the time Armor was the medical provider often had to wait weeks for a response to a medical kite. The counselor stated that inmates would wait a week for Tylenol and two to three weeks for urgent dental needs. He said that the medical providers refused to treat urinary tract infections.

107.   Former counselors or inmates at CJC who were present while Armor was the provider have described how Armor failed to provide inmates with the medications they had been prescribed.

108.   Because Defendant Armor is a national company with a shameful record of providing constitutionally inadequate medical care at carceral institutions across the county, there are numerous examples from other facilities demonstrating Armor's culture, custom, policy, and

practice of deliberate indifference to the serious medical needs of their prisoner-patients. For example:

109.    In September 2010 Raymond Delgado was confined as a pretrial detainee at St. John's County Jail, an Armor facility. In mid-September he reported to Armor medical staff that his father had died of colon cancer and that he had observed blood in his stool. He received no treatment for nearly two months, and on November 4, 2010 notified Armor staff in writing that his symptoms were worsening. His stools were thinning, he was experiencing abdominal tenderness, and had lost 45 pounds in a matter of months. When the Armor doctor saw Mr. Delgado later that month, he confirmed that there was blood in Mr. Delgado's stool, noted that Mr. Delgado was experiencing abdominal discomfort, and prescribed Metamucil – an over-the-counter fiber supplement. Over the next nine months, Mr. Delgado's symptoms persisted and worsened. No colon examination, CT scan, or other routine evaluation for colon cancer was conducted while Mr. Delgado was in the jail even though Armor staff were aware Mr. Delgado had significant weight loss, blood in his stool, abdominal pain, a family history of colon cancer, and was a male over fifty. When Mr. Delgado was transferred to the Department of Corrections (and out of Armor's care), he was finally rushed to the hospital for emergency surgery. The doctors at the hospital discovered colon cancer had perforated his colon and spread to his liver. Due to the long delay in proper examination, diagnosis and treatment, Mr. Delgado's projected five-year survival rate dropped from 74% to as low as 8%. A lawsuit alleging Armor medical staff were deliberately indifferent to Mr. Delgado's serious medical needs was settled shortly before trial.

110.    On November 24, 2010, Austin Clary was booked into the Brevard County Jail, an Armor facility. Mr. Clary and his family members informed various jail personnel that Mr. Clary

suffered from Hypokalemic Periodic Paralysis, a serious medical condition that, if untreated, can cause progressive paralysis, leading to heart failure and death. When Mr. Clary woke up partially paralyzed and repeatedly begged for medical treatment on November 25, jail personnel accused him of faking and Armor staff refused to administer Mr. Clary's prescription medication. Mr. Clary's paralysis progressively worsened over the day and by the time he was released that afternoon, Mr. Clary was completely paralyzed. Due to Armor employees' deliberate indifference to Mr. Clary's serious medical needs, Mr. Clary's potassium levels had dropped to near-fatal levels by the time he was transported by ambulance to a hospital. He was treated in the intensive care unit for two days before he recovered. A lawsuit regarding the incident was settled in 2014.

111.    On the morning of May 11, 2012, concerned drivers called 911 when they saw Allen Hicks, Sr. swerving his car into a guardrail. He was speaking incoherently and unable to move his left arm when arrested for failing to exit his vehicle. Just after noon, he was booked into the Orient Road Jail, an Armor facility. Rather than perform a medical intake screening, Armor medical staff stood by as jail deputies placed Mr. Hicks in a cell where he was observed lying facedown on the floor and attempting to crawl using only the right side of his body. It wasn't until the night of May 12 that Mr. Hicks was finally taken to the hospital, soaked in his own urine, and diagnosed with an ischemic stroke. Mr. Hicks, a beloved baseball coach and father, slipped into a coma and died within three months. In February 2013, Armor paid $800,000 to Mr. Hicks' estate to settle claims arising from the incident.

112.    On August 7, 2012, Karen Ibarra was booked into Sarasota County Jail, an Armor facility. Within days Ms. Ibarra informed jail staff she was having health problems including difficulty walking. Jail staff accused Ms. Ibarra of faking and dragged her by the arms down a

hallway. Ms. Ibarra was not eating or taking her medications and was transferred to the Armor medical unit on August 18th. There, she continued not to eat or take medications for four days. Armor did not send Ms. Ibarra to the hospital even though she had not eaten for days. On the morning of August 22nd, Ms. Ibarra was found unresponsive in her cell with foam coming from her mouth. She had suffered a brain hemorrhage and was pronounced dead later that morning. A lawsuit regarding the incident was settled in 2015.

113. In July 2012, Raleigh Priester, an inmate with schizophrenia died in Broward County Jail, an Armor facility, at just 52 years old. Mr. Priester's schizophrenia went unmedicated despite the fact that the jail psychiatrist thought Mr. Priester's psychosis could have been medically controlled. Armor doctors did not take steps to get Mr. Priester mental health treatment or request a guardian to make medical decisions. Rather, Armor employees rotely accepted this incompetent patient's declinations of care, observed him banging his head on the ground, and watched him starve to death. Mr. Priester also did not get insulin injections, despite having been previously diagnosed with diabetes, because the Armor doctor did not believe Mr. Priester had diabetes. Priester collapsed in his cell and died on July 10, 2012. He had lost 30 pounds in his final six weeks, weighing in at only 120 pounds when he died. Armor settled a lawsuit alleging their deliberate indifference to Mr. Priester's serious mental health and medical needs, and failure to provide him medication caused his death in 2015.

114. Not six months later, in December 2012, William Herring died from starvation in the very same Broward County Jail. The 23-year-old suffered from bipolar disorder and schizophrenia. He informed jail staff that God would tell him when to eat and was kept alone in a cell where he refused to take his mental health medicine, eat, or drink. Mr. Herring's mother

contacted jail staff, told them she was concerned her child was not eating, and pleaded with them to help her son. Over the four weeks he was detained at the jail, Armor staff repeatedly logged Mr. Herring's refusal to take medication, drink and eat. Despite his declining health, Armor personnel's treatment orders reflected little urgency: Continue to monitor. Offer food and fluid. Continue suicide watch. Mr. Herring lost nearly 20 pounds over two weeks. The day before he collapsed and fell into a coma, an Armor nurse noted that Mr. Herring had a "dazed stare" and a tear in the corner of his right eye. Armor settled a lawsuit based on the incident in 2018.

115.     On December 29, 2012, Tommie Lee Jones died at 51 years old of untreated heart failure and emphysema just two weeks after Armor took over medical care at the Niagara County Jail. Other inmates overheard Mr. Jones begging jail and Armor medical staff to take him to the hospital. They observed that Mr. Jones' condition had visibly worsened and watched jail staff "act as if they did not see the dying man." A 2014 report by the New York Commission of Corrections found that Mr. Jones' death was due to "grossly inadequate medical and mental health care," and recommended that the county consider severing its relationship with Armor. In July 2014, Armor paid $100,000 to Mr. Jones' daughter to settle claims arising from her father's death.

116.     Also, in 2012, a class action lawsuit was filed against Armor on behalf of prisoners at the Fluvanna Correctional Center for Women. The plaintiffs sought "declaratory and injunctive relief to address and remedy the failure of FCCW, on a systemic, pervasive and on-going basis, to provide its residents with medical care sufficient either in nature or in extent to satisfy the minimum standards mandated by the Eighth Amendment to the United States Constitution." The case record reflected Armor employees routinely denied prisoners medications, refused requests to see a doctor, and missed appointments for chronic care. In February 2016, plaintiffs, Fluvanna

officials, and Armor finalized a settlement that installed a compliance monitor and other terms designed to ensure Armor would provide the bare minimum level of care.

117.    On July 14, 2014, John Gleeson, a 40-year-old electrician and father of two died in Nassau County Jail, an Armor facility. Mr. Gleeson had a history of hereditary angioedema, a condition where swelling bouts can escalate into breathing emergencies. Mr. Gleeson had repeatedly requested access to the medication he took at home. On the day he died Mr. Gleeson made several trips to the medical unit, where he received Benadryl before being sent back to his cell and locked down for the night. The inmates in Mr. Gleeson's housing unit say that his throat had swelled dramatically, and that Mr. Gleeson had reported serious breathing difficulties in the hours before he died. In its September 15, 2015 Final Report for John Gleeson, the New York State Commission of Correction concluded that Armor's delivery of healthcare "was incompetent and deficient," and that Mr. Gleeson's death may have been prevented if he had been "provided with competent medical care by Armor Inc. in a timely manner, been properly referred to a specialist, received a correct diagnosis, and received proper medical treatment." The Commission directed the Nassau County Legislature to conduct an inquiry into Armor's fitness as a correctional medical care provider, paying specific attention to "Armor's pattern of failing to properly manage patients [sic] chronic medical needs, failing to maintain proper and organized patient records, and failing to provide hospitalization for patients when clinically indicated." Armor settled a lawsuit based on the incident in January 2020.

118.    On May 1, 2015, 28-year-old April Brogan was found dead in a cell at Volusia County Branch Jail, an Armor facility. When she was booked into the facility three days prior, she exhibited clearly observable symptoms of opiate withdrawal. She continued to decline during her

detainment, and various other inmates called Armor, requesting help for Ms. Brogan. Ms. Brogan was vomiting and became extremely dehydrated, but Armor declined to administer intravenous fluids. Armor staff's deliberate indifference to Ms. Brogan's obviously serious medical needs included failing to provide necessary opiate withdrawal treatment during the three days she was in their care. A lawsuit arising from Ms. Brogan's death was brought against Armor, its employees, and other defendants in 2017.

119.    In 2016, John Kinlaw, a detainee at Lunenburg Correctional Center, an Armor facility, fell in the recreation yard and fractured his hand. Despite x-rays showing that Mr. Kinlaw needed significant medical attention, the Armor doctor treated Mr. Kinlaw with just an ice pack and Motrin. Mr. Kinlaw repeatedly informed Armor medical personnel over the next several weeks that he needed further medical attention, but he got none. Mr. Kinlaw was not taken to an orthopedic specialist for 100 days, and when he was taken, the specialist concluded Mr. Kinlaw's hand had healed wrong and could only be fixed by surgery, if at all. Mr. Kinlaw filed suit against Armor, and in July 2019 a jury awarded Mr. Kinlaw over $1 million in compensatory and punitive damages.

120.    On April 1, 2016, Scott Burrell, an inmate at North Broward Bureau jail, and father of two, died a slow and painful death from a common and easily treatable abdominal infection. Two days before his death an Armor LPN examined Mr. Burrell and documented that Mr. Burrell was complaining of severe abdominal pain and had critical vital signs consisting of a weak pulse and a blood oxygen saturation that had decreased to 88%. She also recorded that Mr. Burrell was incontinent, his jail uniform was soaked with urine, he was disheveled, dirty and his gait was so unsteady that he was placed into a wheelchair to be moved to the infirmary. Despite knowing that

Mr. Burrell was medically critical, the LPN did not have Mr. Burrell transferred to an outside hospital for care and treatment.

121.     Mr. Burrell was examined less than an hour later by an Armor Physician Assistant, who recorded that Mr. Burrell was wheelchair bound, disheveled, odiferous, unsteady, short of breath, wearing a blood- and urine-stained uniform, with a rapid heart rate and an elevated temperature. She also failed to have Mr. Burrell sent to an outside hospital for care and treatment, or to make any arrangements to diagnose the cause of Mr. Burrell's critical vital signs and abdominal pain.

122.     Three hours later Armor employees found Mr. Burrell in his cell covered with fresh feces, urine, and vomit and curled in a fetal position. Per the medical records Mr. Burrell's blood pressure had fallen to a critically low level, and his pulse was extremely rapid. Mr. Burrell again stated that his abdomen was painful and winced in pain when he was bathed.

123.     Despite his medically critical condition, Mr. Burrell was not sent to a hospital, but was just moved to the infirmary. Over the next day and a half Mr. Burrell's vital signs remained critical and his mental state was clearly altered. Armor staff made no attempts to diagnose the cause of Mr. Burrell's abdominal pain or move him to a hospital – they simply continued to monitor him. Mr. Burrell was vomiting and exhibiting signs of severe infection and dehydration. He was examined several times by various Armor employees, none of whom took any steps to get Mr. Burrell to the hospital.

124.     At 10:45 a.m. on April 1, 2016, Mr. Burrell was found unresponsive in his cell and was transported to North Broward Medical Center, where he was pronounced dead. The medical examiner concluded that Burrell died from "peritonitis secondary to bowel perforation." Armor

settled a lawsuit related to Mr. Burrell's death in May 2018.

125.    On August 24, 2016, Kristina Fiebrink was brought into the Milwaukee County Justice Facility obviously suffering from alcohol and opiate withdrawal symptoms. Despite her readily observable acute medical condition, Ms. Fiebrink was placed in a general population unit without medical monitoring or access to medical care. She did not receive an intake screening, and by the night of August 27th, Ms. Fiebrink's symptoms had worsened drastically. Through that night and into the morning she was experiencing hallucinations, vomiting, and profuse diarrhea. Despite these obvious acute symptoms, and Ms. Fiebrink's cries for help, which could be heard throughout her general population unit, jail staff provided Ms. Fiebrink no medical care. On the morning of August 28, 2016, Ms. Fiebrink tragically died on the floor of her cell without ever having been seen by Armor medical staff. Armor settled a lawsuit related to Ms. Fiebrink's death in January 2020.

126.    In August 2016, Charles Jones died in Brevard County Jail, an Armor facility. For weeks preceding his death, Mr. Jones had been complaining of severe stomach pain. Days before his bowel burst, Mr. Jones developed numerous symptoms of enterocolitis and/or bowel obstruction, including sharp pains, fatigue, constipation and anemia. Two days before he died, an Armor LPN documented that Mr. Jones' "breath had a fecal odor to it," which is a sign of a bowel blockage. Days later, when he was finally taken to a hospital, Mr. Jones was in septic shock. Armor staff had delayed getting Mr. Jones to the hospital for too long and he died. A lawsuit based on Mr. Jones' death was filed in 2018.

127.    On October 28, 2016, Michael Madden died at the Milwaukee County Jail, an Armor facility. On the day he was detained and in the days that followed, Mr. Madden repeatedly

told Armor medical staff that he had a congenital heart defect, that he was an intravenous drug user, and that he had used intravenous drugs the day he was detained. Medical staff knew that Mr. Madden's history put him at high risk for developing an infection in his heart, and over the course of his detention, Mr. Madden had obvious signs of infective endocarditis—a serious, but treatable, heart infection and medical emergency. In the days preceding his death, after having completed withdrawal protocol, Armor medical staff documented Mr. Madden was experiencing an abnormally high heart rate, extremely low blood pressure, was pale, and was so weak he could hardly walk. He had a fever and chest pains, and submitted written requests to be seen by medical staff. When Mr. Madden began hyperventilating on the morning of October 28th, Armor nursing staff asked Mr. Madden to try to slow his breathing and to relax rather than calling for an ambulance. Mr. Madden was forced to attempt to walk to the medical unit and was by then so weak he fell several times, smashing his head on concrete twice. When Mr. Madden was finally transported by wheelchair to the clinic he was not breathing and was ultimately pronounced dead. A lawsuit related to the incident was filed in 2018.

128.    In 2016 Terrill Thomas, a 38-year-old father of six died of dehydration in Milwaukee County Jail, an Armor facility. Armor medical staff were aware that Mr. Thomas had a history of bipolar disorder, including a known prescription for psychotropic medication. They were also aware that Mr. Thomas was diabetic and had hypertension. Armor failed to provide Mr. Thomas medication, blood sugar tests, blood pressure measurements, or any mental health care the entire time he was in their care.

129.    Mr. Thomas predictably decompensated due to being unmedicated and flooded his cell while obviously suffering a mental health crisis. Jail staff moved Mr. Thomas to the

disciplinary unit and ordered his bedding removed and water turned off until his behavior improved. There, despite being seen numerous times by Armor medical staff, Mr. Thomas spent the last week of his life locked in an isolation cell 24 hours a day, with no drinking water, no edible food, no working toilet, no mattress, no blanket, no shower access, no means of cleaning his cell, no ability to communicate with his family, no relief from constant lockdown, and no meaningful access to urgently needed medical or mental health care. He languished and suffered in this filthy, unsanitary cell with nothing but his jail uniform and rations of nutraloaf, which, without water, were inedible. Other inmates reported to jail staff that Mr. Thomas desperately needed water and medical care, but none came. Mr. Thomas was found dead in his cell eight days after being booked into the facility. He had lost 34 pounds.

130.    Armor was criminally charged with seven counts of intentionally falsifying Mr. Thomas' health care records in February 2018. The complaint alleged Armor employees "engaged in a pattern and practice of intentionally falsifying entries in inmate patient health care records." The district court denied Armor's motion to dismiss the criminal charges, concluding that evidence in the criminal complaints established probable cause, in part, because, "[t]he employees served a corporate goal of minimizing staffing cost at the workplace."

131.    Milwaukee County and Armor later paid Mr. Thomas' estate $6.75 million to settle a civil lawsuit arising from his death.

132.    In 2016, following the successive deaths of several inmates in Nassau County Jail, an Armor facility, the New York State Commission of Correction issued a series of scathing reports, concluding Armor was "incapable of providing competent medical care." In the report concerning the death of William Satchell, the Commission concluded the death of the father of

four "was preventable if not for the shocking level of inadequate medical care and negligence of the [Armor's] medical staff." The Commission further emphasized that Armor repeatedly failed to recognize "life-threatening manifestations" of "a new onset medical condition" or diabetes. Armor also made a "definite medication error," giving Mr. Satchell an antipsychotic known to increase blood sugar levels and possibly sparking the onset of his "unstable condition," the Commission found. It further concluded Armor "grossly mismanaged" Mr. Satchell's high blood pressure and delayed seeking emergency hospital care for "a critically unstable" patient, which was "contributory to his death."

133.    In 2016 the New York Attorney General filed suit against Armor, alleging a "failure to provide access to medications" as one of several ways Armor failed to meet contractual obligations and placed inmates at risk. In five separate cases since 2011, state investigators found that inmates died due to inadequate medical care provided by Armor. Armor agreed to pay $350,000 and not bid on any contracts in the state for three years in a 2016 settlement with the New York Attorney General.

134.    El Paso County Defendants have a non-delegable duty to provide constitutionally sufficient medical care to inmates and detainees and are therefore liable for the unconstitutional actions of Armor and its employees toward Mr. Plutt.

135.    Armor's failure to deliver needed medical care to Mr. Plutt was motivated by constitutionally impermissible profit-driven reasons. In order to make higher profits on its contract, the company had a widespread policy, practice, and custom of budgeting and spending inadequate amounts on jail medical care and delaying or declining to send inmates to the hospital or an outside specialist. It was foreseeable that the insufficient budgeting and spending and refusing to send

inmates to the hospital or outside specialists would cause harm to detainees in need of medical care, and such conduct caused or substantially contributed to Mr. Plutt's unnecessary pain and suffering and the unchecked spread of his infection to the point that it became life-threatening.

136.    Armor failed to adequately train its personnel to recognize and respond to the serious medical needs of detainees. Armor also failed to train its nursing staff on how to conduct proper medical examinations. The need for this training was obvious, and it was foreseeable that such training deficiencies would cause harm to detainees.

137.    Alarming deficiencies in screening, staffing, monitoring, and the delivery of medical and mental health care were also identified in previous notices and were otherwise known and obvious to Armor for years prior to Mr. Plutt's arrival at CJC. Despite this knowledge, Armor and its corporate officials chose not to rectify the problems, putting the lives of its incarcerated patients at risk.

138.    The corporate policies, practices, and customs described above were a moving force behind Mr. Plutt's prolonged suffering and the unchecked spread of his infection and the constitutional violations alleged in this complaint.

139.    Armor also ratified the unconstitutional conduct of its employees and agents with respect to the mistreatment of Mr. Plutt. Armor tacitly condoned these deficient actions by failing to adequately investigate what happened and failing to discipline the responsible healthcare workers.

### **The County and Wellpath**

140.    Though Wellpath has only been the medical provider at CJC for a little over a year, Wellpath's and the El Paso County Defendants' custom, policy, or practice of deliberate

indifference and their lack of adequate training, supervision, and discipline regarding assessing and treating the serious medical needs of those in custody at CJC is already in evidence.

141.    In addition to their deliberate indifference to Mr. Plutt's needs, Wellpath and the El Paso County Defendants have been deliberately indifferent as the coronavirus ran rampant through CJC. Though the outbreak began in March and raged throughout the summer, masks were not distributed across the CJC inmate population until November 2020. During that time, more than three quarters of the jail's inmate population became infected.

142.    According to a former counselor at CJC, inmates at CJC during the time Wellpath was the medical provider often had to wait weeks for a response to a medical kite. The counselor stated that inmates would wait a week for Tylenol and two to three weeks for urgent dental needs. He said that the medical providers refused to treat urinary tract infections.

143.    Former counselors or inmates at CJC who were present while Wellpath was the provider have described how Wellpath failed to provide inmates with the medications they had been prescribed.

144.    It was also well known at the time the County hired Wellpath that the for-profit medical provider has a custom, practice, and policy of disregarding and minimizing inmates' medical complaints, depriving their patients of prescription medications, and failing to order diagnostic testing and timely send patients to the hospital in order to save money.

145.    In contracts all over the country Wellpath agrees to cover all costs, up to a limit, for detainees who require diagnostic testing or outside medical services, including hospitalization and specialized treatment for serious illnesses and medical emergencies.

146.    It appears from the terms of the request for proposal for the CJC contract that

Wellpath's customary financial arrangement was also in place at the CJC:

> 1. Proposer [Wellpath] shall make referral arrangements with healthcare specialists/agencies for treatment of those committed inmates with problems which extend beyond the scope of services provided on-site. Proposer shall pay all costs of such specialists and services.
>
> 2. The costs of committing and/or hospitalizing and transporting inmates to outside facilities will be the responsibility of the Proposer except as noted in Section III(H)(3) [The county arranges for the inmate's return].
>
> 3. In the event of an emergency, Proposer shall provide and pay for all emergency care, emergency transportation and referrals to appropriate hospitals and physicians.
>
> . . .
>
> 1. When hospitalization of an inmate is required, Proposer shall be responsible for the arrangement and payment of all hospital care to include all related medical expenses. Where applicable, Proposer shall be responsible for billing **Medicaid** for qualified off-site medical treatment of inmates.
>
> . . .
>
> 3. Proposer shall also be responsible for arranging the transport of the inmate or client, i.e. – ambulance to and from the hospital.*
> *The [El Paso Sheriff's Office] arranges for the return of the inmate.

147.    Accordingly, Wellpath has a strong financial incentive not to send seriously ill patients to an outside health care provider.

148.    Indeed, Wellpath's and its predecessor entity's pattern of increasing profits by delaying sending inmates to the hospital and outside specialists has been widely documented by regulatory and criminal enforcement bodies.

149.    In 2007, the National Commission on Correctional Health Care ("NCCCS") auditors reported serious and systemic deficiencies in the care provided to prisoners by CCS-

related companies in the Tulsa jail, including failure to triage sick calls and failure to address health needs in a timely manner.

150.    In 2008, the Department of Justice (DOJ) found that the jail medical program, administered by a CCS-related entity, was constitutionally deficient in a number of regards. Specifically, the DOJ found problems in "providing appropriate access to medical care during emergencies," citing a case where a woman went into premature labor and delivered a baby while handcuffed to a chair rail. This happened after her complaints, including that her water had broken, were ignored. The DOJ found that there were "critical lapses in getting emergency medical care to detainees." The DOJ also noted that they had conducted a previous tour in 2003 and that, despite many years to remedy the violations found, "we generally did not observe improved conditions at the time of the second tour."

151.    In 2009, an Oklahoma Department of Health investigation found that deficiencies by CCS-related companies continued unabated despite the abundant notice of the same from NCCCS and DOJ.

152.    In 2010, during a NCCCS audit, high-level employees of CCS attempted to fraudulently change medical records to give the appearance of compliance. NCCCS found deficient care, deficient investigation into deaths, and a lack of timely diagnostic and specialty services. Even after this audit, CCS did not take the corrective measures necessary to alleviate the obvious and substantial risks to inmate health. High-level CCS employees repeatedly brought to CCS's attention the many serious deficiencies, including chronic failures to triage medical requests, falsification of records, and refusals to treat inmates with life-threatening conditions, but the corporation refused to make any changes to the way CCS-related companies operated.

153.    In November 2011, the Tulsa County Jail's own retained auditor found deficiencies in CCS's care.

154.    In 2011, U.S. Immigration and Customs Enforcement and the U.S. Department of Homeland Security's Office of Civil Rights and Civil Liberties ("CRCL") conducted a review of the medical care provided by CCS and related companies, reporting: "CRCL found a prevailing attitude among clinic staff of indifference….", "Nurses are undertrained. Not documenting or evaluating patients properly."

155.    Because Defendant Wellpath is a national company with a shameful record of providing constitutionally inadequate medical care at carceral institutions across the county, there are numerous examples from other facilities demonstrating Wellpath's culture, custom, policy, and practice of deliberate indifference to the serious medical needs of their prisoner-patients. For example:

156.    Wellpath's predecessor entity previously provided medical services to CJC, with results that now seem predictable. Bruce Howard, a CJC inmate, died of cardiac arrhythmia in 2008 after CCS staff denied him his heart pills and ignored his repeated pleas for medical assistance. He received no treatment despite his visible shakiness and assertions that he was hallucinating.

157.    Michael Eastman, a detainee at Jefferson County Detention Facility (JCDF) during 2014 and 2015, suffered from back/spinal pain due to severe chronic cervical spondylosis. Despite numerous requests and kites to medical, Mr. Eastman never received any treatment while housed at JCDF and, like Mr. Plutt, was misled to believe treatment had been ordered. CCS medical staff failed to provide access to timely medical treatment by qualified medical providers and acted with

deliberate indifference by ignoring repeated requests for an appointment with a neurologist, causing Mr. Eastman pain, suffering, and permanent injuries.

158.    In 2014, Thomas Beauford, a detainee housed in Mesa County Detention Facility, died from a series of epileptic seizures. CCS staff failed to provide Mr. Beauford's prescription medications to prevent seizures and failed to timely respond with medical attention after observing him experience multiple seizures in his cell.

159.    In 2012, Lyvita Gomes died of starvation and dehydration in Lake County Jail in Illinois, a CCS facility, when CCS and its employees failed to treat Ms. Gomes or provide timely transportation to a hospital.

160.    In 2017, Denny Lovern died in Arapahoe County Detention Facility in Colorado as a result of a cardiac emergency after CCS staff refused for multiple days to send him to the medical unit or hospitalize him.

161.    In 2013, Rashod McNulty died in a county jail in New York as a consequence of inadequate care provided by CCS or a related subsidiary. CCS employees failed to place Mr. McNulty in the medical unit or hospitalize him. A report concluded CCS employees committed professional misconduct for their failures leading to his death.

162.    In 2011, Donna Pillard died in a Nebraska jail whose medical care CCS was responsible for, leading to a wrongful death suit for failure to treat or transfer to the hospital the sick woman, and a confidential settlement.

163.    Kenneth McGill sued CCS over its failure in 2012 to protect his well-being in response to a stroke he suffered in Jefferson County jail in Colorado. This case went to trial and resulted in a plaintiff's verdict of about $11 million, including about $8 million in punitive

damages awarded by the jury because of CCS's profit-driven policy against sending inmates for outside medical treatment or hospitalization.

164.    In 2014, a company CCS acquired was responsible for the death of John Walter in Fremont County Detention Center in Colorado, due to the failure to medicate, monitor, or timely transfer to a hospital, resulting in a settlement for $4.25 million.

165.    In 2013, the estates of three detainees who died in the Tulsa County Jail and another former inmate sued CCS for causing the deaths and near-death through its "longstanding policy, practice or custom" of "refusing to send inmates with emergent medical needs to the hospital for purely financial purposes."

166.    In 2015, Jennifer Lobato died in Jefferson County jail in Colorado as a result of CCS's and other defendants' failures to treat withdrawal symptoms or transfer to a medical unit or hospital, leading to a $2.5 million settlement against the County and a confidential settlement against CCS.

167.    In 2016, Matthew McCain died in Durham County jail, North Carolina, after CCS and its employees failed to timely send him to the hospital or care for his well-being, leading to a wrongful death lawsuit.

168.    In 2006, Michael Moritz died in Tulsa county jail when CCS's employees failed to treat him and failed to timely hospitalize him.

169.    In 2012, at a CCS facility in Texas, CCS failed to treat a pretrial detainee's obvious signs of labor or to timely hospitalize her, resulting in the baby dying shortly after its birth on the floor of a solitary cell.

170.    In 2009, CCS failed to timely treat Robert Turley or transport him to a doctor or

the hospital, resulting in significant medical complication and pain from an untreated esophageal perforation.

171.    In 2009, Charles Holdstock died at a facility in Oklahoma where services were provided by a CCS-related entity. There, CCS went further for Mr. Holdstock than it did for Mr. Plutt and actually ordered labs, but then ignored the results showing that Mr. Holdstock's kidneys were not functioning properly (and were failing to eliminate the toxic build-up of his heart medication). Mr. Holdstock was found unresponsive on his cell floor and later died.

172.    In Pierce County, Washington, prosecutor Grace Kingman stated that a jury would likely find CCS/Conmed (formerly) "incompetent, unprofessional and morally reprehensible" arising from four deaths of inmates under their care in 2013 and 2014, and in which the County sued CCS.

173.    In 2013, Christina Boshers died in Kitsap County jail in Washington arising from CCS's failure to timely hospitalize or treat her condition, resulting in a lawsuit that likely eventually settled given the parties voluntarily dismissed it before trial.

174.    El Paso County Defendants have a non-delegable duty to provide constitutionally sufficient medical care to inmates and detainees and are therefore liable for the unconstitutional actions of Wellpath and its employees toward Mr. Plutt.

175.    Wellpath's failure to deliver needed medical care to Mr. Plutt was motivated by constitutionally impermissible profit-driven reasons. In order to make higher profits on its contract, the company had a widespread policy, practice, and custom of budgeting and spending inadequate amounts on jail medical care and delaying or declining to send inmates to the hospital or an outside specialist. It was foreseeable that the insufficient budgeting and spending and refusing to send

inmates to the hospital or outside specialists would cause harm to detainees in need of medical care, and such conduct caused or substantially contributed to Mr. Plutt's unnecessary pain and suffering and the unchecked spread of his infection to the point that it became life-threatening.

176. Wellpath failed to adequately train its personnel to recognize and respond to the serious medical needs of detainees. Wellpath also failed to train its nursing staff on how to conduct proper medical examinations. The need for this training was obvious, and it was foreseeable that such training deficiencies would cause harm to detainees.

177. Alarming deficiencies in screening, staffing, monitoring, and the delivery of medical and mental health care were also identified in previous notices and were otherwise known and obvious to Wellpath for years prior to Mr. Plutt's harrowing ordeal. Despite this knowledge, Wellpath and its corporate officials chose not to rectify the problems, putting the lives of its incarcerated patients at risk.

178. The corporate policies, practices, and customs described above were a moving force behind Mr. Plutt's prolonged suffering and the unchecked spread of his infection and the constitutional violations alleged in this complaint.

179. Wellpath also ratified the unconstitutional conduct of its employees and agents with respect to the mistreatment of Mr. Plutt. Wellpath tacitly condoned these deficient actions by failing to adequately investigate what happened and failing to discipline the responsible healthcare workers.

## V.  CLAIMS FOR RELIEF

**FIRST CLAIM FOR RELIEF**
**Violation of 42 U.S.C. § 1983 – Eighth Amendment**
**Unconstitutional Lack of Medical Care**
(Against each Individual Medical Provider Defendant)

180.    Mr. Plutt hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

181.    42 U.S.C. § 1983 provides that:

Every person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory or the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress . . .

182.    Mr. Plutt is a citizen of the United States, and Defendants to this claim are persons for the purposes of 42 U.S.C. § 1983.

183.    Mr. Plutt was an inmate. As an inmate, he was protected from deliberate indifference to his known serious medical needs by the Eighth Amendment.

184.    There is no qualified immunity for private actors working in a jail. In addition, at all relevant times, the Individual Medical Provider Defendants knew of these clearly established constitutional rights of inmates and knew that their conduct violated clearly established law.

185.    Each Individual Medical Provider Defendant, at all times relevant hereto, was acting under color of state law.

186.    As a result of the allegations contained in this Complaint, the Individual Medical Provider Defendants are liable under 42 U.S.C. § 1983 for violating of Mr. Plutt's Eighth Amendment rights by acting with deliberate indifference to his serious medical needs and

disregarding the excessive risks of serious harm described herein, despite being expressly aware of the excessive dangers to health and safety posed.

187.   Each of the Individual Medical Provider Defendants subjectively knew about and was deliberately indifferent to the dangers posed, which they intentionally and deliberately disregarded. They knew of these excessive risks because they were obvious.

188.   All Individual Medical Provider Defendants personally participated in the constitutional deprivations described herein by treating or failing to treat Mr. Plutt's serious medical condition.

189.   The acts or omissions of these Defendants were the legal and proximate cause of Plaintiff's injuries and damages, including his avoidable and prolonged pain and suffering, the avoidable and prolonged spread of the infection, the avoidable and prolonged deterioration of his condition, and severe risk to his life.

190.   As a direct and proximate result of these Defendants' unlawful conduct, Mr. Plutt has suffered injuries and losses entitling him to recover its compensatory and special damages, including for suffering, pain, and and other special damages, all in amounts to be proven at trial.

191.   Plaintiff is entitled to attorneys' fees and costs pursuant to 42 U.S.C.§ 1988, pre-judgment interest and costs as allowable by federal law.

192.   Plaintiff is also entitled to punitive damages against these Defendants, in that their actions were taken maliciously, willfully or with a reckless or wanton disregard of the constitutional rights of Plaintiff.

**SECOND CLAIM FOR RELIEF**
**Violation of 42 U.S.C. § 1983 – Eighth Amendment**
**Unconstitutional Lack of Medical Care**
(against CJC Staff Defendants)

193.    Mr. Plutt hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

194.    Defendants to this claim are persons for the purposes of 42 U.S.C. § 1983.

195.    Each CJC Staff Defendant, at all times relevant hereto, was acting under color of state law.

196.    Mr. Plutt was an inmate. As an inmate, he had a clearly established right under the Eighth Amendment to be protected from deliberate indifference to his known serious medical needs. At all relevant times, the CJC Staff Defendants knew of these clearly established constitutional rights of inmates and knew that their conduct violated clearly established law. Any objectively reasonable law enforcement or detention staff officer would have known of this clearly established law.

197.    These Defendants' actions and inactions deprived Plaintiff of his Constitutional right to protection from deliberate indifference to his known serious medical needs. These Defendants were deliberately indifferent to known and excessive risks of serious harm to Plaintiff.

198.    For the many reasons stated herein and incorporated by reference, the CJC Staff Defendants are liable under 42 U.S.C. § 1983 for the violations of Plaintiff's rights under the Eighth Amendment by acting with deliberate indifference to his serious medical needs and disregarding the excessive risks of serious harm described herein, despite being expressly aware

of the excessive dangers to health and safety posed. Any objectively reasonable officer would have known that these Defendants' conduct posed an excessive risk to the health and safety of Mr. Plutt.

199.    Each of the Defendants identified herein subjectively knew about and was deliberately indifferent to the dangers posed, which they intentionally and deliberately disregarded. They knew of these excessive risks because they were obvious.

200.    The acts or omissions of these Defendants were the legal and proximate cause of Plaintiff's injuries and damages, including his avoidable and prolonged pain and suffering, the avoidable and prolonged spread of the infection, the avoidable and prolonged deterioration of his condition, and severe risk to his life.

201.    As a direct and proximate result of these Defendants' unlawful conduct, Plaintiff has suffered injuries and losses entitling him to recover compensatory and special damages, including for suffering, pain, and and other special damages, all in amounts to be proven at trial.

202.    Plaintiff is entitled to attorneys' fees and costs pursuant to 42 U.S.C.§ 1988, pre-judgment interest and costs as allowable by federal law.

203.    Plaintiff is also entitled to punitive damages against these Defendants, in that their actions were taken maliciously, willfully or with a reckless or wanton disregard of the constitutional rights of Plaintiff.

**THIRD CLAIM FOR RELIEF**
**Violation of 42 U.S.C. § 1983 – Eighth Amendment**
**Unconstitutional Policies and Failure to Train and Supervise**
(against Entity Defendants)

204.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

205.    As a result of the allegations contained in this Complaint, each Entity Defendant is liable under 42 U.S.C. § 1983 for maintaining deliberately indifferent policies and failing with deliberate indifference to properly train and supervise their employees to provide necessary attention and medical care to inmates at CJC.[2]

206.    The Entity Defendants were each, at all relevant times, acting under color of state law. Each Entity Defendant is a "person" within the meaning of 42 U.S.C. § 1983.

207.    The El Paso County Defendants are non delegably liable for the constitutional violations of Armor and Wellpath and employees of these entities.

208.    Policies include written policies as well as customs, habits, training, and practices. The unconstitutional policies of Defendants to this claim resulted in the violation of Mr. Plutt's Eighth Amendment right to adequate medical care and to humane conditions of confinement.

209.    Entity Defendants knew that the aforementioned policies, practices, and customs, as applicable to each, posed a substantial risk of serious harm to inmates like Mr. Plutt, and it was obvious that such harm would occur. Nevertheless, Defendants failed to take reasonable steps to alleviate those risks of harm. There is an affirmative causal link between the deliberate indifference

---

[2] Mr. Plutt also intends to argue that the 10th Circuit case *Smedley v. Corr. Corp. of Am.*, 175 F. App'x 943, 946 (10th Cir. 2005) was wrongly decided and that respondeat superior should apply to private entities in § 1983 actions. *See Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 795 (7th Cir. 2014) ("For all of these reasons, a new approach may be needed for whether corporations should be insulated from respondeat superior liability under § 1983. Since prisons and prison medical services are increasingly being contracted out to private parties, reducing private employers' incentives to prevent their employees from violating inmates' constitutional rights raises serious concerns. Nothing in the Supreme Court's jurisprudence or the relevant circuit court decisions provides a sufficiently compelling reason to disregard the important policy considerations underpinning the doctrine of respondeat superior. And in a world of increasingly privatized state services, the doctrine could help to protect people from tortious deprivations of their constitutional right.")

of the Individual Defendants towards Plaintiff's medical needs and the policies, practices, and customs described herein. Such polices, practices, and customs were the moving force behind the Individual Defendants' unconstitutional conduct and the moving force behind and legal and proximate cause of Plaintiff's injuries and damages.

210.    In the light of the duties assigned to individual health care workers and deputies, the need for more or different training and supervision of them was obvious, and the failure to do so by the Entity Defendants was deliberately indifferent to the rights of the relevant public and a moving force in the injuries to Mr. Plutt

211.    The Entity Defendants ratified the unconstitutional conduct of their employees, agents, and/or subcontractors with regard to the unconstitutional conduct visited upon Plaintiff, as they approved of the conduct and the basis for it.

212.    The unconstitutional acts and omissions of Entity Defendants were moving forces in the unconstitutional acts of the Individual Defendants.

213.    The acts or omissions of these Defendants were the legal and proximate cause of Mr. Plutt's injuries.

214.    As a direct and proximate result of these Defendants' unlawful conduct, Mr. Plutt has suffered injuries and losses entitling him to recover its compensatory and special damages, including for suffering, pain, and and other special damages, all in amounts to be proven at trial.

215.    Mr. Plutt is entitled to attorneys' fees and costs pursuant to 42 U.S.C.§1988, pre-judgment interest and costs as allowable by federal law.

216.    Mr. Plutt is also entitled to punitive damages against Armor and Wellpath, in that their actions were taken maliciously, willfully or with a reckless or wanton disregard of the constitutional rights of Plaintiff.

**FOURTH CLAIM FOR RELIEF**
**Violations of Title II of the Americans with Disabilities Act**
(Against El Paso County)

217.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

218.    The ADA and its implementing regulations specifically prohibit discrimination in public services on the basis of disability. 42 U.S.C. § 12132 states:

> Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

219.    The ADA defines a "public entity" to include any state or local government or any department, agency, special purpose district, or other instrumentality of a state or local government. 42 U.S.C. § 12131(1). As noted above, CJC, El Paso County Sheriff's Office, and BOCC are operated under the auspices of El Paso County. El Paso County is a "public entity" within the meaning of the ADA.

220.    Plaintiff is a qualified individual with disabilities within the meaning of the ADA, meaning he has one or more physical and/or mental impairments that substantially limit one or more major life activities within the meaning of the ADA. 42 U.S.C. § 12102(2)(A).

221.     Plaintiff met the essential eligibility requirements for the receipt of services or participation in the programs or activities provided by El Paso County at all times relevant to this matter. 42 U.S.C. § 12131(2).

222.     El Paso County excluded Plaintiff from participation in services, programs, and activities, and denied him the rights and benefits afforded to other individuals detained at CJC, solely by reason of his disabilities and in violation of the ADA. Moreover, El Paso County has violated the ADA by intentionally failing or refusing to provide reasonable accommodations to Plaintiff and other persons with disabilities. Among other things, El Paso County precluded Plaintiff from participating in the work program for more than a month based solely on his disability; precluded him from safely using the shower by failing to provide handrails or a shower chair throughout the time Plaintiff was incarcerated; and precluded Plaintiff from safely accessing counseling, group, and therapy sessions by failing to provide a way to reach those sessions other than by using the stairs.

223.     El Paso County has willfully disregarded its duties under the ADA and has knowingly allowed unlawful policies and practices to persist related to the provision of services, programs, and activities to individuals with disabilities, and specifically with respect to individuals with disabilities who are incarcerated at CJC.

224.     As a direct and proximate result of the acts, omissions, and violations alleged above, Plaintiff has suffered damages, injuries, pain and suffering, emotional distress, impairment of quality of life, past and future economic losses, including loss of earnings and reasonable and necessary medical and other expenses.

**FIFTH CLAIM FOR RELIEF**
**Violations of Section 504 of the Rehabilitation Act of 1973**
(Against County Defendants)

225.     Plaintiff hereby incorporates all other paragraphs of this Complaint as if set forth fully herein.

226.     Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794(a), provides in pertinent part:

> No otherwise qualified individual with a disability in the United States, as defined in Section 7(20), shall, solely by reason of her or his disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal Financial assistance . . . .

227.     At all times relevant to this action, Plaintiff was a qualified individual with one or more disabilities within the meaning of Section 504.

228.     Plaintiff was qualified to participate in the services, programs, activities, and benefits provided to other individuals detained at CJC and subject to the custody of El Paso County within the meaning of Section 504.

229.     At all times relevant to this action, El Paso County received and benefitted from direct federal financial assistance.

230.     El Paso County denied the Plaintiff access to programs, benefits, and services provided to other individuals detained at CJC, and for which the Plaintiff was qualified to participate, solely on the basis of his disabilities, thereby violating Section 504. Specifically, and without limitation, El Paso County discriminated against the Plaintiff by:

    a.   Precluding him from participating in the work program for more than a month based solely on his physical disability;

b.  Precluding him from safely using the shower by failing to provide handrails or a shower chair throughout the time Plaintiff was incarcerated; and

c.  Precluding him from safely accessing counseling, group, and therapy sessions by failing to provide a way to reach those sessions other than using the stairs.

231.  Despite the clear provisions of Section 504, El Paso County persisted in imposing policies and actual practices which discriminate against Plaintiff and other persons incarcerated at CJC.

232.  As a direct and proximate result of the acts, omissions, and violations alleged above, Plaintiff suffered damages, injuries, pain and suffering, emotional distress, impairment of quality of life, and economic losses, including loss of earnings and reasonable and necessary medical and other expenses.

**SIXTH CLAIM FOR RELIEF**
**Medical Negligence Causing Serious Bodily Harm**
(Against Individual Medical Provider Defendants and Corporate Defendants)

233.  Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

234.  Corporate Defendants are private corporations that contract or contracted with El Paso County to provide medical care and health services to inmates at CJC. Individual Medical Provider Defendants are private individuals, and not public officials or employees. Corporate Defendants and Individual Medical Provider Defendants are therefore not entitled to any immunity under the CGIA and are not entitled to notice under the CGIA.

235.  At all times relevant to this action, Plaintiff was under the medical responsibility, care, and treatment of the Individual Medical Provider Defendants and the Corporate Defendants.

236.    These Defendants had a duty to provide reasonable medical care and treatment to detainees at the CJC, including Plaintiff.

237.    Corporate Defendants had the duty to exercise reasonable care in the training and supervision of their employees. These duties of care are informed by state law. Under C.R.S. § 16-3-401, "[p]ersons arrested or in custody shall be treated humanely and provided with adequate food, shelter, and, if required, medical treatment." The provision of adequate medical treatment and humane care is a statutory obligation.

238.    Through their actions and omissions, the Individual Medical Provider Defendants and other care providers breached their duty of care when they knowingly failed to assess, monitor, treat and care for the Plaintiff, despite that fact that he was in obvious need of immediate medical attention.

239.    The Individual Medical Provider Defendants had provider-patient relationships with the Plaintiff at all relevant times and were acting within the scope of their employment throughout the duration of these relationships.

240.    With respect to their care and treatment of the Plaintiff, the Individual Medical Provider Defendants owed him a duty to exercise the degree of care, skill, caution, diligence, and foresight exercised by and expected of medical personnel in similar situations. The Individual Medical Provider Defendants breached that standard of care and were negligent in failing to properly assess, monitor, treat, and care for the Plaintiff.

241.    As a direct and proximate result of the Individual Medical Provider Defendants' having breached their duty to provide reasonable medical care and treatment to the Plaintiff, he suffered significant physical and mental pain and suffering, and other damages.

242.    The Corporate Defendants are vicariously liable for the negligent acts and omissions by their agents and/or employees, including, but not limited to, those named individually herein, and those directly liable for their own negligent failures in training, policies, and practices.

243.    The Corporate Defendants are also directly liable as they breached their duty to exercise reasonable care in the training and supervision of their employees and agent in a manner that provided the detainees under their care with reasonable medical care and treatment.

244.    The Corporate Defendants knew or should have known of the lack of supervision, experience, and training among their employees and agents was likely to harm CJC inmates in need of medical care, including Plaintiff.

245.    In failing to exercise reasonable care in the training and supervision of their employees and agents, as it relates to their providing reasonable medical care and treatment, the Corporate Defendants were negligent and proximately caused Plaintiff's suffering and injuries.

246.    The negligent acts and omissions by the Individual Medical Provider Defendants and Corporate Defendants were a substantial and significant contributing proximate cause of Plaintiff's suffering and injuries.

247.    As a result of negligence described herein, Plaintiff suffered damages, losses and injuries in an amount to be determined by the jury at trial.

248.    The conduct of the Individual Medical Provider Defendants and the Corporate Defendants was attended by circumstances of malice, or willful and wanton conduct.

### PRAYER FOR RELIEF

WHEREFORE, the Plaintiff prays that the Court award against Defendants:

(a)      All appropriate relief at law and equity;

(b)      Economic losses on all claims allowed by law;

(c)      All available compensatory and consequential damages, including, but not limited to, all available damages for pain and suffering, physical, mental and emotional distress, and all other non-economic and economic damages available under the law;

(d)      Punitive damages on all claims as allowed by law and in an amount to be determined at trial;

(e)      Attorneys' fees and costs, including expert witness fees;

(f)      Pre- and post-judgment interest as appropriate; and

(g)      Any further relief at law or equity that this Court deems just and proper.

### PLAINTIFF RESPECTFULLY REQUESTS TRIAL BY JURY.

Respectfully submitted this 4th day of November, 2021.

*s/ Jamie Hubbard*
Jamie Hubbard
Stimson Stancil LaBranche Hubbard, LLC
1652 Downing Street
Denver, CO 80218
Tel./Fax: 720.689.8909
hubbard@sslhlaw.com

*Attorneys for Plaintiff*

**Certificate of Service**

I certify that on November 4, 2021, I electronically filed the foregoing *Complaint and Jury Demand* with the Clerk of Court using the CM/ECF system.

*s/ Brenda Rodriguez*
Brenda Rodriguez