IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Philip A. Brimmer**

Civil Action No. 21-cv-02969-PAB-MDB

DANIEL W. PLUTT, individually,

     Plaintiff,

v.

ARMOR CORRECTIONAL HEALTH SERVICES, INC.;
WELLPATH LLC;
EL PASO COUNTY, COLORADO;
BOARD OF COUNTY COMMISSIONERS, EL PASO COUNTY;
SHERIFF BILL ELDER, in his official capacity;
KATHLEEN SYLTE, individually;
AMANDA HUTCHINSON, individually;
HUNTER GRANT, individually;
ROBERT PERO, individually;
SAMUEL COFIELD, individually;
JOSEPH FELDMAN, individually;
DAVID WHITAKER, individually;
DENISE HOLLOWAY, individually; and
Jane and John Does 1-10,

     Defendants.

---

## ORDER

---

     This matter is before the Court on the County Defendants' Motion to Dismiss

[Docket No. 48].  The Court has jurisdiction pursuant to 28 U.S.C. § 1331.

## I.  BACKGROUND[1]

     Plaintiff brings this case based on the medical care he received while

---

[1]  The Court assumes that the well-pled allegations in plaintiff's complaint are true in considering the motion to dismiss.  *Brown v. Montoya*, 662 F.3d 1152, 1162 (10th Cir. 2011).

incarcerated at the El Paso County Criminal Justice Center ("CJC" or "jail") in Colorado

Springs, Colorado.  Docket No. 1 at 1-2, 4, ¶¶ 1-4.  Defendants are El Paso County, the

Board of Commissioners of El Paso County, and the sheriff of El Paso County

(collectively, "El Paso County"); deputies Samuel Cofield, David Whitaker, Joseph

Feldman, and Denise Holloway at the CJC ("EPSO defendants"; together with El Paso

County, "County defendants"); CJC medical providers Kathleen Sylte, Amanda

Hutchinson, Hunter Grant, and Robert Pero; and the companies that employed those

medical providers, Armor Correctional Health Services, Inc. ("Armor") and Wellpath LLC

("Wellpath").  *Id.* at 4-8, ¶¶ 11-36.  Armor and Wellpath are private companies that

provide health care services.  *Id.* at 5-6, ¶¶ 17, 21.  El Paso County hired Armor to

provide medical services to inmates at the CJC from July 15, 2017 to December 31,

2019.  *Id.* at 5, ¶ 18.  Starting on January 1, 2020, Wellpath contracted with El Paso

County to provide medical services to inmates.[2]  *Id.* at 6, ¶ 22.

Plaintiff was incarcerated at the CJC beginning on November 11, 2019.  *Id.* at 9,

¶ 39.  Shortly before his incarceration, plaintiff's leg had been amputated below the

knee.  *Id.*  Plaintiff underwent a medical evaluation upon arrival at the CJC, and the

"provider" was aware of plaintiff's recent amputation.  *Id.* at 10, ¶ 45.

Beginning on December 22, 2019, red bumps, some of which were visibly filled

with puss, began appearing on and around the amputation site.  *Id.* at 11, ¶ 47.  Plaintiff

asked Deputy Cofield, Deputy Whitaker, Deputy Feldman and "other CJC staff" to take

---

[2] The medical personnel at CJC, as relevant here, did not change as a result of
Wellpath replacing Armor.  Docket No. 1 at 17, ¶ 76.

him to medical on multiple occasions, but they denied it each time.[3]  *Id.*  Plaintiff then

submitted a kite for medical attention.  *Id.*, ¶ 48.  On December 23, 2019, plaintiff told

CJC staff about his condition, "staff" responded that they were going to take him to the

on-site doctor that night, but they never did.  *Id.*, ¶ 49.  Plaintiff alleges that "[t]he jail

denied him medical attention again on December 24[, 2019]," *id.*, but does not explain

how.  Plaintiff's conditioned worsened.  *Id.*, ¶ 50.  On December 25, 2019, defendant

Amanda Hutchinson, a medical employee of Armor, responded to plaintiff's kite that he

had been "scheduled with wound care to assess the wound."  *Id.*, ¶ 51.  Plaintiff waited

in the holding cell outside the medical area for medical treatment for over four hours

before he decided to return to his housing unit without receiving care.  *Id.* at 11-12,

¶ 51.

Plaintiff did not receive any treatment on December 26, 2019.  *Id.* at 12, ¶ 52.

By December 27, 2019, one of the pustules had swollen to the size of a golf ball and

other pustules had also grown.  *Id.*, ¶ 53.  A doctor saw plaintiff on December 27, 2019,

but told plaintiff that he was "not certified to touch Mr. Plutt's leg."  *Id.*, ¶ 54.  Plaintiff

grew sweaty and feverish, his pain increased, and his infection spread; one pustule was

the size of a "half dollar."  *Id.*, ¶ 55.  On December 28, 2019, Ms. Hutchinson assessed

plaintiff's leg and noted "R/O ingrown hair vs insect bite."  *Id.* at 13, ¶ 56.  Ms.

Hutchinson applied topical cleanser and ointment and advised plaintiff to return if the

red bumps spread or opened.  *Id.*  On December 29, 2019, Hunter Grant, R.N., an

employee of Armor, ordered a course of antibiotics for plaintiff.  *Id.* at 7, 13, ¶¶ 29, 57.

_____

[3] The complaint refers to Deputies Cofield, Whitaker, Feldman, and Holloway, deputies within the CJC, as "CJC Staff Defendants."  Docket No. 1 at 8, ¶ 36.

The antibiotics appeared to work; plaintiff was extremely ill for a few days, but the abscesses subsided.  *Id.* at 13, ¶ 58.  Plaintiff returned to medical on January 15, 2020 and "Medical" reported that the wound was healing appropriately.  *Id.*, ¶ 59.

By January 23, 2020, the infection had returned and sores were visible on and around the amputation site.  *Id.*, ¶ 60.  Plaintiff asked CJC staff for a visit to medical but was denied; a kite he submitted went unanswered.  *Id.*, ¶ 61.  Plaintiff showed "jail staff" his leg and asked for help.  *Id.*, ¶ 62.  On January 25, 2020, plaintiff could barely walk. *Id.* at 13-14, ¶ 62.  Deputy Cofield told plaintiff that he was scheduled for medical, but Deputy Cofield did not know when it would happen.  *Id.* at 14, ¶ 62.  Between January 25 and January 29, plaintiff's pain increased and the infection spread.  *Id.*, ¶ 63.  By January 27, plaintiff could barely move his leg.  *Id.* at 15, ¶ 65.  On January 28, Deputies Feldman and Holloway brought plaintiff a wheelchair because he could no longer walk; however, they did not get plaintiff any medical attention.  *Id.*  Plaintiff sent at least five kites, showed the abscesses on his legs to Deputies Cofield, Whitaker, and Feldman, and "pleaded" with them.[4]  *Id.*, ¶ 66.  Plaintiff spent hours in the holding cell outside of medical waiting to be seen.  *Id.*  However, when he was seen, the medical staff "did nothing more than apply topical spray and a band-aid."  *Id.*

On January 29, Ms. Hutchinson, now an employee of Wellpath, evaluated plaintiff and noted multiple abscesses "above" his amputation site.  *Id.* at 16, ¶ 67. Robert Pero, M.D., an employee of Wellpath, prescribed antibiotics to plaintiff.  *Id.* at 7,

---

[4] The parties dispute what time period the allegations in paragraph 66 pertain to. *Compare* Docket No. 59 at 4, *with* Docket No. 62 at 2 n.2.  The Court addresses this dispute *infra* Section III.A.3.b.

16, ¶¶ 30, 67.  The same day, plaintiff received a state court-ordered furlough to obtain medical care.  *Id.* at 16, ¶ 68.  Plaintiff's father immediately took plaintiff to a hospital, where the hospital staff stabilized his condition, ordered lab cultures, "unroof[ed]" the pustules, and irrigated and debrided the wounds.  *Id.*, ¶ 71.  Hospital staff prescribed and administered IV antibiotics and fentanyl for pain.  *Id.*  Plaintiff stayed in the intensive care unit for several days due to the seriousness of his infection.  *Id.* at 17, ¶ 72.  Plaintiff's lab cultures indicated that he had methicillin resistant staphylococcus aureus ("MRSA").  *Id.*, ¶ 73.  At no point during his incarceration had CJC medical staff taken lab cultures or "unroofed" his pustules.  *See id.* at 13, 16, ¶¶ 57, 67.

On November 4, 2021, plaintiff filed this lawsuit against defendants.  *See* Docket No. 1.  Plaintiff brings six claims: (1) Eighth Amendment unconstitutional lack of medical care against the medical personnel at CJC; (2) Eighth Amendment unconstitutional lack of medical care against the EPSO defendants; (3) Eighth Amendment unconstitutional policies and failure to train against El Paso County, Armor, and Wellpath; (4) violations of Title II of the Americans with Disabilities Act against El Paso County; (5) violations of Section 504 of the Rehabilitation Act of 1973 against County defendants; and (6) medical negligence against the CJC medical personnel, Armor, and Wellpath.  *Id.* at 46-57, ¶¶ 180-248.

On February 4, 2022, El Paso County, the Board of County Commissioners of El Paso County, Sheriff Bill Elder, Deputy Cofield, Deputy Feldman, Deputy Whitaker, and Deputy Holloway moved to dismiss claims two, three, four, and five.[5]  Docket No. 48 at

---

[5] The motion to dismiss and response refer to El Paso County, the Board of County Commissioners of El Paso County, and Sheriff Bill Elder collectively as "El Paso

1-2.  Plaintiff responded, Docket No. 59, and County defendants replied.  Docket No.

62.  On July 14, 2022, County defendants filed a notice of supplemental authority

relating to claims four and five.  *See* Docket No. 71.  On July 26, 2022, plaintiff

responded to the supplemental authority.  *See* Docket No. 75.  On August 11, 2022,

Wellpath and certain Wellpath employees filed a Joinder in the County Defendants'

Motion to Dismiss, Docket No. 85, indicating that they joined in Section IV(D) of the

County defendants' motion to dismiss.  *Id.* at 1-2.  Plaintiff responded to this joinder.

Docket No. 86.  Wellpath filed a reply in support of its joinder.  Docket No. 87.

## II.  LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil

Procedure, a complaint must allege enough factual matter that, taken as true, makes

the plaintiff's "claim to relief . . . plausible on its face."  *Khalik v. United Air Lines*, 671

F.3d 1188, 1190 (10th Cir. 2012) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

(2007)).  "The 'plausibility' standard requires that relief must plausibly follow from the

facts alleged, not that the facts themselves be plausible."  *RE/MAX, LLC v. Quicken*

*Loans Inc.*, 295 F. Supp. 3d 1163, 1168 (D. Colo. 2018) (citing *Bryson v. Gonzales*, 534

F.3d 1282, 1286 (10th Cir. 2008)).  Generally, "[s]pecific facts are not necessary; the

statement need only 'give the defendant fair notice of what the claim is and the grounds

upon which it rests.'"  *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam) (quoting

*Twombly*, 550 U.S. at 555) (alterations omitted).  A court, however, does not need to

---

County" and Samuel Cofield, Joseph Feldman, David Whitaker, and Denise Holloway
collectively as the "EPSO Defendants."  *See* Docket No. 48 at 1 n.1; Docket No. 59 at 1
n.1.  The Court will use the same references.  The Court will refer to the combination of
all seven defendants as the "County defendants."

accept conclusory allegations.  *See, e.g.*, *Hackford v. Babbit*, 14 F.3d 1457, 1465 (10th Cir. 1994) ("[W]e are not bound by conclusory allegations, unwarranted inferences, or legal conclusions.").  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not shown – that the pleader is entitled to relief."  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (quotations and alterations omitted); *see also Khalik*, 671 F.3d at 1190 ("A plaintiff must nudge [his] claims across the line from conceivable to plausible in order to survive a motion to dismiss." (quoting *Twombly*, 550 U.S. at 570)).  If a complaint's allegations are "so general that they encompass a wide swath of conduct, much of it innocent," then plaintiff has not stated a plausible claim.  *Khalik*, 671 F.3d at 1191 (quotations omitted).  Thus, even though modern rules of pleading are somewhat forgiving, "a complaint still must contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory."  *Bryson*, 534 F.3d at 1286 (alterations omitted).

## III.  ANALYSIS

### A.  Claim Two

Plaintiffs' second claim is for violation of his right under the Eighth Amendment to be free from deliberate indifference to known serious medical needs.[6]  Docket No. 1 at 48-49, ¶¶ 193-203.  Plaintiff brings this claim pursuant to § 1983 against the EPSO

---

[6] The Court applies the same deliberate indifference standard whether the person is a convicted prisoner and governed by the Eighth Amendment or a pre-trial detainee and governed by the Fourteenth Amendment.  *Strain v. Regalado*, 977 F.3d 984, 989 (10th Cir. 2020) ("[W]e apply the same deliberate indifference standard no matter which amendment provides the constitutional basis for the claim.").

defendants in their individual capacities.  *See id.*  EPSO defendants move to dismiss claim two on three grounds: (1) the complaint fails to identify which defendant is alleged to have done what and to whom;[7] (2) the complaint fails to state an Eighth Amendment violation; and (3) EPSO defendants are entitled to qualified immunity.  Docket No. 48 at 6-10.

A claim for deliberate indifference to serious medical needs has an objective and a subjective component.  *Strain*, 977 F.3d at 989.  "[T]he focus of the objective component is the seriousness of the plaintiff's alleged harm, while the focus of the subjective component is the mental state of the defendant with respect to the risk of that harm."  *Prince v. Sheriff of Carter Cnty.*, 28 F.4th 1033, 1044 (10th Cir. 2022).  The objective component requires that the medical need be "sufficiently serious."  *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000).  "A medical need is [objectively] serious if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  *Clark v. Colbert*, 895 F.3d 1258, 1267 (10th Cir. 2018).  "A delay in medical care can also be sufficiently serious if the delay resulted in substantial harm. The substantial harm requirement may be satisfied by lifelong handicap, permanent loss, or considerable pain."  *Est. of Beauford v. Mesa Cnty., Colo.*, 35 F.4th 1248, 1262 (10th Cir. 2022) (internal citation and quotation marks omitted).

The subjective component requires that "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from

---

[7] The Court will evaluate this argument in the context of whether the complaint states a claim as to each EPSO defendant.

which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 1263 (quoting *Farmer* v. *Brennan*, 511 U.S. 825, 834 (1994)).  "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Mata v. Saiz*, 427 F.3d 745, 752 (10th Cir. 2005) (citation omitted).  "This is so because if a risk is obvious so that a reasonable man would realize it, we might well infer that the defendant did in fact realize it." *Id*. (brackets, citation, and internal quotation marks omitted).  But "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844.

EPSO defendants argue that claim two fails under both the objective and subjective prong of deliberate indifference.  Docket No. 48 at 7-9.  Specifically, EPSO defendants argue that (1) plaintiff initially presented with a rash or spider bite, which is not sufficiently serious to satisfy the objective prong, and (2) the complaint does not allege when any EPSO defendant became aware that the condition had progressed to a sufficiently serious one and therefore does not allege that any EPSO defendant delayed or denied medical care for a sufficiently serious condition.  *Id.*

### 1.  Objective Prong

Plaintiff argues that EPSO defendants' delay in obtaining medical care for plaintiff in December and January was deliberately indifferent.  Docket No. 59 at 5-6.

Plaintiff can satisfy the objective component based on a "delay in medical care . . . if 'the delay resulted in substantial harm.'" *Est. of Beauford*, 35 F.4th at 1262 (quoting *Mata*, 427 F.3d at 751). "The substantial harm requirement may be satisfied by lifelong handicap, permanent loss, or considerable pain." *Id.* (quoting *Mata*, 427 F.3d at 751). The "substantial harm" may be based on "an intermediate injury, such as the pain experienced while waiting for treatment and analgesics." *Al-Turki v. Robinson*, 762 F.3d 1188, 1193 (10th Cir. 2014) (citation omitted). "Or it may be based on the inmate's 'ultimate harm.'" *Paugh v. Uintah Cnty.*, – F.4th –, 2022 WL 4093078, at *8 (10th Cir. Sept. 7, 2022) (citing *Mata*, 427 F.3d at 754 (explaining that an inmate's "ultimate harm, heart damage, would satisfy the objective component")). While the plaintiff selects what harm to claim, sometimes a plaintiff will be better off claiming an intermediate harm rather than the ultimate harm he suffered. *Id.* "This is because the plaintiff 'may not be able to prove that this last event was caused by any government actor or that the actor who caused the event acted with the requisite culpable state of mind.'" *Id.* (quoting *Mata*, 427 F.3d at 753).

Plaintiff argues that the objective component is satisfied by plaintiff's life-threatening MRSA infection. Docket No. 59 at 5. By choosing the life-threatening MRSA infection, plaintiff has selected the "ultimate harm," *see Paugh*, 2022 WL 4093078, at *8, as the harm that satisfies the objective prong. Plaintiff's condition in December 2019 and early January 2020 cannot be considered life-threatening because he responded positively to the antibiotics and his infection subsided at that point. Thus, plaintiff's condition before January 23, 2020 cannot satisfy the objective prong. Plaintiff

suffered the "ultimate harm" of a life-threatening MRSA infection after January 23,

2020.  EPSO defendants contest the objective prong of deliberate indifference, *see*

Docket No. 48 at 7-9, but agree that plaintiff's MRSA was a "life-threatening infection."

*Id.* at 8; *see also* Docket No. 62 at 5 ("Undoubtedly, MRSA constitutes a serious

medical condition.").  When plaintiff's MRSA infection reached the life-threatening

stage, it was sufficiently serious to satisfy the objective prong of deliberate indifference.

### 2.  *Subjective Prong*

EPSO defendants argue that the complaint fails to specify when any EPSO

defendant became aware of plaintiff's sufficiently serious condition such that a delay

could constitute deliberate indifference.  Docket No. 48 at 8-9.  As noted above,

plaintiff's MRSA infection, at the point it was life-threatening, is sufficient to satisfy the

objective prong.  "The focus of the subjective component of the deliberate indifference

inquiry is the mental state of the defendant regarding the risk of harm."  *Est. of*

*Beauford*, 35 F.4th at 1268.  "[A] factfinder may conclude that a prison official knew of a

substantial risk from the very fact that the risk was obvious."  *Paugh*, 2022 WL

4093078, at *9 (quoting *Quintana v. Santa Fe Cnty. Bd. of Comm'rs*, 979 F.3d 1022,

1029 (10th Cir. 2020)).  In *Quintana*, the Tenth Circuit noted that unconsciousness, "a

gangrenous hand[,] or a serious laceration" qualify as "obvious" signs of medical

distress.  973 F.3d at 1029.

For the subjective component, the symptoms displayed by the inmate are

relevant.  *Martinez v. Beggs*, 563 F.3d 1082, 1089 (10th Cir. 2009).  "Whether a prison

official had the requisite knowledge of a substantial risk is a question of fact subject to

demonstration in the usual ways, including inference from circumstantial evidence."

*Farmer*, 511 U.S. at 842.  The fact that a serious medical need was "obvious" could be

evidence of deliberate indifference, although a "prison official may show that the

obvious escaped him" and avoid liability.  *Id*. at 843 n.8; *see id.* at 842-43.  The

question is: "were the symptoms such that a prison employee knew the risk to the

prisoner and chose (recklessly) to disregard it?"  *Mata*, 427 F.3d at 753.

### 3. Sufficiency of the Allegations Against the EPSO Defendants

EPSO defendants argue that the complaint "fails to isolate the alleged

unconstitutional act(s) of each EPSO Deputy."  Docket No. 48 at 7.  Plaintiff argues that

the allegations against each EPSO defendant are similar because each deputy had the

same role.  Docket No. 59 at 5.

"[I]n a § 1983 action it is particularly important that the complaint make clear

exactly *who* is alleged to have done *what* to *whom*, to provide each individual with fair

notice as to the basis of the claims against him or her, as distinguished from collective

allegations against the state."  *Montoya*, 662 F.3d at 1163 (quotations and citation

omitted).  The complaint refers to Deputies Cofield, Whitaker, Feldman, and Holloway

collectively as "CJC Staff Defendants."  Docket No. 1 at 8, ¶ 36.  However, none of the

allegations detailing the care plaintiff received in December and January use the term

CJC Staff Defendants.  *See id.* at 11-17, ¶¶ 47-74.  At various points plaintiff uses the

term "CJC staff" and "jail staff," *see id.* at 13, ¶¶ 61-62, but the Court has no basis to

construe this phrase to mean the EPSO defendants.

### a.  November 11, 2019 to January 22, 2020

The allegations regarding EPSO defendants between November 11, 2019 and January 22, 2020 are insufficient to state a claim because plaintiff cannot satisfy the objective component of deliberate indifference for this period of time.  As the Court noted above, plaintiff has pursued the "ultimate harm" of a life threatening MRSA infection in order to satisfy the objective prong.  However, plaintiff's infection between November 11, 2019 and January 22, 2020 cannot be considered life threatening at that point because it had improved with treatment and had not yet returned as of January 22, 2020.  *See supra* Section III.A.1.  Because the allegations in this time frame do not satisfy the objective component, the Court need not consider whether they satisfy the subjective component for each EPSO defendant.

### b.  January 23, 2020 to January 29, 2020

The well-pled allegations after the return of plaintiff's infection on January 23, 2020 establish the following.  Plaintiff had visible sores on and around the amputation site by January 23, 2020.  *Id.*, ¶ 60.  Plaintiff asked "CJC staff" for a medical visit and showed "jail staff" his leg.  *Id.*, ¶¶ 61-62.  However, the date this took place is unclear and, as noted above, the references to "CJC staff" and "jail staff" are too vague to identify the EPSO defendants.  On January 25, 2020, Deputy Cofield told plaintiff that plaintiff was scheduled for a medical visit, but Deputy Cofield did not know when it would happen.  *Id.* at 13-14, ¶ 62.  Plaintiff could barely walk by January 25 and the abscesses were "fire red and throbbed with pain."  *Id.* at 14, ¶ 63.  The abscesses continued to get worse and, on January 28, Deputies Feldman and Holloway brought

13

plaintiff a chair because he could no longer walk.  *Id.* at 15, ¶ 65.

The complaint alleges a claim against each EPSO defendant based on a denial or delay of medical care.  However, the allegations against each EPSO defendant are insufficient to find the subjective prong of deliberate indifference met for the period January 23 to January 29.  First, the only allegation with respect to Deputy Holloway is that she brought plaintiff a wheelchair on January 28 and did not get him medical attention.  *Id.*  There is no allegation that plaintiff showed Deputy Holloway his leg, told her about his infection, or that she knew why he needed a wheelchair, apart from not being able to walk.

In paragraph 66, plaintiff makes the following allegations with respect to Deputies Cofield, Whitaker, and Feldman: (1) plaintiff showed them lesions on his leg and "pleaded" with them, and (2) they "watched as he lost the ability to walk."  *Id.*, ¶ 66. Paragraph 66 additionally indicates that plaintiff spent hours in the holding cell outside of medical waiting to be seen, but that when he was seen medical staff provided insufficient care.  *Id.*  Paragraph 66, however, does not provide a date range.  Instead, it states that these events transpired "[d]uring this time."  *Id.*  The logical reading of paragraph 66 is that it refers to the preceding paragraph, which pertains to January 27 and 28.  *Id.*, ¶ 65.  In his response to the motion to dismiss, plaintiff argues that the phrase "[d]uring this time" means January 23 to January 28, Docket No. 59 at 4, but that is not what the complaint states.  Additionally, paragraph 67 states that plaintiff saw medical "again" on January 29, indicating that he had seen medical at some unspecified time before then.  *Id.* at 16, ¶ 67.

Accordingly, the well-pled allegations are that plaintiff pleaded with Deputies Cofield, Whitaker, and Feldman and they saw his condition and deterioration between January 27 and 28.  However, the complaint does not state that plaintiff pleaded with them *for medical care*, and indeed, he was seen by medical during this time frame. Plaintiff additionally alleges that, on January 25, Deputy Cofield told plaintiff that he would be seen, but Deputy Cofield did not know when.  *Id.* at 13-14, ¶ 62.  None of these allegations indicate that any of the EPSO defendants denied or delayed treatment for plaintiff's serious medical need.

The subjective component requires that "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Est. of Beauford*, 35 F.4th at 1263 (quoting *Farmer*, 511 U.S. at 834).  Plaintiff's complaint fails to plead that each EPSO defendant was aware of the life-threatening nature of plaintiff's infection in January 2020.  Additionally, "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted."  *Farmer*, 511 U.S. at 844.  Even assuming each EPSO defendant was aware of the seriousness of the infection, there are no allegations that they responded unreasonably.  Plaintiff received medical care between January 27 and 28.  *See Est. of Beauford*, 35 F.4th at 1265 ("Prison officials generally may rely on the advice and course of treatment prescribed by medical personnel.").  There is no indication that any EPSO defendant denied or delayed medical care by the time plaintiff's infection was life-threatening.  As the Tenth Circuit noted, sometimes a

15

plaintiff will be better off claiming an intermediate harm because "the plaintiff 'may not be able to prove that this last event was caused by any government actor or that the actor who caused the event acted with the requisite culpable state of mind.'" *Paugh*, 2022 WL 4093078, at *8 (quoting *Mata*, 427 F.3d at 753). Here, plaintiff has pursued the "ultimate harm," but he has not pled facts sufficient to state a claim for deliberate indifference for the delay or denial of medical care by EPSO defendants under the subjective prong. Accordingly, the Court will grant EPSO defendants' motion to dismiss claim two.

### B. Claim Three

Plaintiff's third claim is against El Paso County, Armor, and Wellpath for Eighth Amendment violations due to unconstitutional policies and failure to train and supervise.[8] Docket No. 1 at 49-52, ¶¶ 204-216. Plaintiff alleges that the unconstitutional policies, practices, and customs were the moving force behind the individual defendants' unconstitutional conduct and the proximate cause of plaintiff's injuries. *Id.* at 50-51, ¶ 209.

"Local governing bodies . . . can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where . . . the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially

---

[8] The complaint also states that the plaintiff intends to argue that the Tenth Circuit's decision in *Smedley v. Corrs. Corp. Of Am.*, 175 F. App'x 943, 946 (10th Cir. 2005) (unpublished), which states that "a private actor . . . 'cannot be held liable *solely* because it employs a tortfeasor – or, in other words . . . cannot be held liable under § 1983 on a *respondeat superior* theory,'" *id.* (quoting *Monell*, 436 U.S. at 691), was wrongly decided. Docket No. 1 at 50 n.2. However, plaintiff made no such argument and the Court is bound by Tenth Circuit precedent. Accordingly, plaintiff fails to state a claim against Armor and Wellpath under a theory of *respondeat superior*.

adopted and promulgated by that body's officers."  *Monell v. Dep't of Social Servs.*, 436

U.S. 658, 690 (1978) (footnote omitted).  "[I]t is when execution of a government's

policy or custom, whether made by its lawmakers or by those whose edicts or acts may

fairly be said to represent official policy, inflicts the injury that the government as an

entity is responsible under § 1983."  *Id.* at 694.  The Tenth Circuit "has extended *Monell*

liability to private entities" under certain circumstances.  *Est. of Beauford*, 35 F.4th at

1275 (citing *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1216-1217 (10th Cir. 2003)).

      To state a claim for municipal liability under § 1983, a party must allege sufficient

facts to demonstrate that it is plausible (1) that a municipal employee committed a

constitutional violation; and (2) that a municipal policy or custom was the moving force

behind the constitutional deprivation.  *Jiron v. City of Lakewood*, 392 F.3d 410, 419

(10th Cir. 2004).  A municipal policy or custom can take the form of

> (1) a formal regulation or policy statement; (2) an informal custom
> amoun[ting] to a widespread practice that, although not authorized by
> written law or express municipal policy, is so permanent and well settled
> as to constitute a custom or usage with the force of law; (3) the decisions
> of employees with final policymaking authority; (4) the ratification by such
> final policymakers of the decisions – and the basis for them – of
> subordinates to whom authority was delegated subject to these
> policymakers' review and approval; or (5) the failure to adequately train or
> supervise employees, so long as that failure results from 'deliberate
> indifference' to the injuries that may be caused.

*Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010) (citations omitted).

      Plaintiff's complaint and response to the motion to dismiss do little to differentiate

which form of a municipal policy or custom El Paso County allegedly promulgated.

Plaintiff's response to the motion to dismiss focuses on an informal custom amounting

to widespread practice and a failure to adequately train.  Docket No. 59 at 10 ("[T]he

Complaint alleges that Armor and Wellpath each had a widespread policy, practice, and custom of budgeting and spending inadequate amounts on jail medical care and delaying or declining to send inmates to the hospital or an outside specialist.  ¶¶ 135, 175.  The Complaint further alleges that Armor and Wellpath each failed to adequately train its personnel.").  The Court interprets the complaint to allege (1) a formal policy, *see* Docket No. 1 at 50, ¶ 208 ("Policies include written policies."); (2) an informal custom amounting to a widespread practice, *see id.* ("Policies include . . . customs, habits, training, and practices."); (3) failure to train, *see id.* at 51, ¶ 210 ("[T]he need for more and different training and supervision of [health care workers and deputies] was obvious."); and (4) ratification, *see id.*, ¶ 211 ("The Entity Defendants ratified the unconstitutional conduct of their employees.").

"A municipality is liable only when the official policy [or custom] is the moving force behind the injury alleged."  *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998).  "A plaintiff must therefore 'identify a government's policy or custom' that caused the injury.'"  *Cacioppo v. Town of Vail*, 528 F. App'x 929, 931 (10th Cir. 2013) (unpublished) (quoting *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 769 (10th Cir. 2013)).  "The plaintiff must then show 'that the policy was enacted or maintained with deliberate indifference to an almost inevitable constitutional injury.'"  *Id.* (quoting *Schneider*, 717 F.3d at 769).

"The deliberate indifference standard may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to

18

disregard the risk of harm." *Barney*, 143 F.3d at 1307. "[C]ontinued adherence to an approach that [the decision makers] know or should know has failed to prevent tortious conduct by employees may establish . . . conscious disregard." *Bd. Of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 407 (1997); *see also Rowe v. City of Marlow*, 116 F.3d 1489, 1997 WL 353001, at *6 (10th Cir. June 26, 1997) (unpublished table decision) ("Municipal liability for failure to train or supervise requires a finding that the municipality's deliberate indifference 'led an employee to violate a plaintiff's rights' or 'failed to prevent tortious conduct by employees.'" (quoting *Brown*, 520 U.S. at 407)).

Plaintiff's constitutional injury was his life-threatening MRSA infection. *See supra* Section III.A.1. This did not arise until January, when Armor was no longer the medical provider at the CJC. Plaintiff undoubtedly suffered pain in December, when Armor was the medical provider, but his condition improved with treatment and cannot be considered "life-threatening" in December 2019. Plaintiff chose to pursue the "ultimate harm" as the one satisfying the objective prong of deliberate indifference. Here, the complaint cannot warrant a finding of liability for El Paso County in December 2019 based on an Armor policy of deliberate indifference because the ultimate harm did not occur until January 2020, when Wellpath was the medical provider. Accordingly, for each of the asserted types of policy, the Court rejects the allegations against Armor.

### 1. Formal Policy

To base a municipal liability claim on an unconstitutional formal policy, a plaintiff should set out the text of that policy. *Sandberg v. Englewood*, 727 F. App'x 950, 964 (10th Cir. 2018) (unpublished) (granting a motion to dismiss a claim for an

unconstitutional policy because the complaint did not "set[] out the text of any [] policy").

Plaintiff argues that Armor and Wellpath had a policy of spending inadequate amounts on jail medical care and delaying or declining to send inmates to outside care.  Docket No. 59 at 10.  However, plaintiff has not set out the text of that policy.  Such a "bare allegation" of an unconstitutional policy "is not nearly enough to show deliberate indifference."  *See J.V. v. Albuquerque Pub. Sch.*, 813 F.3d 1289, 1298 (10th Cir. 2016).

To the extent the complaint can be construed to allege that El Paso County's contracts with Armor and Wellpath, wherein Armor and Wellpath were required to pay for outside medical services, *see, e.g.*, Docket No. 1 at 38-39, ¶ 64 (alleging that Wellpath's "customary financial arrangement" was in place at the CJC based on Wellpath's terms in the request for proposal for the CJC contract), was a formal policy, the Court rejects this argument.  The contracts were not a formal regulation or policy statement.  The Court will instead evaluate the contracts in the context of contributing to an informal custom amounting to widespread practice.

### 2. *Informal Custom Amounting to Widespread Practice*

Municipalities may "incur liability when they adopt unconstitutional 'longstanding practice[s] or custom[s]' that become 'standard operating procedure[s].'"  *Murphy v. City of Tulsa*, 950 F.3d 641, 649 (10th Cir. 2019) (quoting *Jett v. Dallas Indep. Sch. Dist*., 491 U.S. 701, 737 (1989)).  "In attempting to prove the existence of such a continuing, persistent and widespread custom, plaintiffs most commonly offer evidence suggesting that similarly situated individuals were mistreated by the municipality in a similar way."

*Carney v. City & Cnty. of Denver*, 534 F.3d 1269, 1274 (10th Cir. 2008) (quotations

omitted).

> With informal, unwritten policies, customs, or practices, the plaintiff can
> plead either a pattern of multiple similar instances of misconduct – no set
> number is required, and the more unique the misconduct is, and the more
> similar the incidents are to one another, the smaller the required number
> will be to render the alleged policy plausible – or use other evidence, such
> as a police officers' statements attesting to the policy's existence.

*Griego v. City of Albuquerque*, 100 F. Supp. 3d 1192, 1213 (D.N.M. 2015).

El Paso County argues that the complaint fails to allege an informal custom

amounting to widespread practice of deliberate indifference and fails to allege

causation.  Docket No. 48 at 12-14.  Plaintiff's response boils down to three arguments:

(1) El Paso County was deliberately indifferent by contracting with Wellpath, a known

deficient provider, and including financial incentives to provide deficient care; (2) El

Paso County is responsible for the unconstitutional customs of Wellpath; and (3) El

Paso County maintained a custom of deliberate indifference to inmates' serious medical

needs.  Docket No. 59 at 9-14.

### a.  Contract Between El Paso County and Wellpath

Plaintiff's assertion that El Paso County's contract with Wellpath incentivized

keeping costs low, and then reaching the conclusion that the alleged delay or denial of

medical care to plaintiff was the result of policy or practice to keep costs low, lacks

sufficient factual allegations to create the necessary link between the alleged financial

incentive and the treatment plaintiff received.  *Sherman v. Klenke*, 653 F. App'x 580,

592 (10th Cir. 2016) (unpublished) ("[t]he naked assertion that Defendants considered

cost in treating [an inmate's] hernia does not suffice to state a claim for deliberate

indifference"). In *Sherman,* the Tenth Circuit found persuasive an unpublished Third

Circuit decision on cost-saving policies. *Id.* (citing *Winslow v. Prison Health Servs*., 406

F. App'x 671, 674 (3d Cir. 2011) (unpublished)). In *Winslow*, the Third Circuit indicated

that, to plausibly allege a cost-saving policy that was the moving force behind the

constitutional violation, a plaintiff must allege "(1) what the relevant policies are, (2)

what basis [plaintiff] has for thinking that policies to save money affected his medical

treatment, [and] (3) what specific treatment he was denied as a result of these policies."

406 F. App'x at 674.

  While plaintiff makes allegations of understaffing at the CJC when Armor was

providing care, *see* Docket No. 1 at 23, ¶ 94, plaintiff makes no allegations regarding

the staffing levels at CJC while Wellpath provided care. Plaintiff provides no basis to

think that the policy to save money affected his care. Instead, his allegations

connecting his denial of care with cost-saving are entirely conclusory. *Compare id.* at

38, ¶ 144 ("It was also well known at the time the County hired Wellpath that the for-

profit medical provider has a custom, practice, and policy of disregarding and

minimizing inmates' medical complaints, depriving their patients of prescription

medications, and failing to order diagnostic testing and timely send patients to the

hospital in order to save money."); *with McDonald v. Wexford Health Sources*, 2010 WL

3034529, at *3 (N.D. Ill. July 30, 2010) (plaintiff sufficiently stated a Monell claim where

he alleged that, due to cost-cutting measures, there was "a decreased number of

medical technicians in the [jail] cell houses . . . which resulted in [the plaintiff] having to

wait weeks, and sometimes months to receive medical care; and leaving [the plaintiff]

without access to a medication to lower his cholesterol"); *see also Steele v. Wexford Health Sources, Inc.*, 2018 WL 2388429, at \*8 (N.D. Ill. May 25, 2018) (finding that the plaintiff sufficiently alleged a policy or practice of sacrificing medical care for cost savings where the plaintiff's allegations "directly connect[ed] the dots between [the alleged] policy or practice and [the plaintiff's] injury: he allege[d] significant delays in his referral to an outside specialist as a direct result of [the healthcare entity's] cost-cutting policy related to internal staffing and outside referrals" and where "the link between the alleged cost-cutting policy or practice and [the plaintiff's] injury [was] plausible" because the treatments the plaintiff needed were "expensive").  Accordingly, the Court finds the El Paso County did not act with deliberate indifference by including cost-saving financial incentives in its contract with Wellpath.

### b.  Unconstitutional Customs of Wellpath

Plaintiff's second argument is that El Paso County can be held liable for the unconstitutional customs of Wellpath.  Docket No. 59 at 9-11.  El Paso County does not seriously dispute that it can be held liable for Wellpath's unconstitutional customs under the non-delegable duty doctrine, *see* Docket No. 48 at 11 ("For the non-delegable duty to apply, to the extent it exists, the contractor must maintain an unconstitutional policy . . . ."), and the Court rejects the argument to the extent El Paso County makes it. *See Hernandez de la Torre v. La Plata County*, No. 21-cv-01422-CMA-NRN, 2022 WL 1193471, at \*4-5 (D. Colo. Feb. 11, 2022) (collecting cases holding that a private healthcare company's deficient policy, practice, or custom can be attributed to the

county or municipality under the non-delegation doctrine), *report and recommendation adopted*, 2022 WL 910710 (D. Colo. Mar. 29, 2022).

Plaintiff argues that Wellpath had a custom of delaying or declining to send inmates to receive outside healthcare. Docket No. 59 at 10 (citing Docket No. 1 at 44-45, ¶ 175). The Court considers whether the complaint alleges such an informal custom amounting to widespread practice.

The complaint alleges a significant number of instances of Correct Care Solutions ("CCS") delaying or denying medical care to inmates. *See* Docket No. 1 at 41-44, ¶¶ 156-73. Wellpath is the product of a merger between CCS and another private healthcare provider. *Id.* at 6, ¶ 21. The complaint alleges that, "[u]pon information and belief, Wellpath is the successor in interest to CCS." *Id.* The complaint acknowledges that Wellpath has only been the medical provider at the CJC for "a little over a year," but alleges that its "custom, policy, or practice of deliberate indifference and [Wellpath's] lack of adequate training, supervision, and discipline regarding assessing and treating the serious medical needs of those in custody at CJC is already in evidence." *Id.* at 37-38, ¶ 140. The complaint makes various allegations about Wellpath's conduct at the CJC. *Id.* at 38-39, ¶¶ 141-48. The complaint then makes allegations about insufficient medical care by CCS, not Wellpath. *See id.* at 39-44, ¶¶ 149-73. Plaintiff alleges that Wellpath is a "national company with a shameful record," *id.* at 41, ¶ 155, but at no point does plaintiff allege that Wellpath is using CCS's unconstitutional customs or indicate how a custom of Wellpath can be found based on a CCS custom. Plaintiff's allegations that Wellpath is the successor in

interest to CCS is insufficient to allege that Wellpath is using CCS's customs. Accordingly, the Court only considers the allegations made specifically with respect to Wellpath.

The complaint describes Wellpath's insufficient response to the COVID-19 pandemic, slow responses to medical kites, slow responses to dental needs, medical providers' refusal to treat urinary tract infections, and the failure to provide inmates with their prescription medications. *Id.* at 38, ¶¶ 141-43. The complaint then describes Wellpath's financial incentives to delay sending inmates to hospitals. *Id*. at 38-39, ¶¶ 144-48. The Court has already considered and rejected Wellpath's financial incentives as a basis for municipal liability in this case. The remainder of the allegations do not support a Wellpath custom of delaying or declining to send inmates to the hospital or an outside specialist. The allegations in the complaint are entirely unrelated to the need to send an inmate to receive outside care. Accordingly, the Court finds that plaintiff has not alleged a Wellpath "informal custom amoun[ting] to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law," *Bryson*, 627 F.3d at 788 (internal quotation marks omitted), of failing to send inmates to the hospital or an outside specialist.

### c. El Paso County's Custom of Deliberate Indifference

Plaintiff also argues that "the Complaint alleges that the El Paso County Defendants maintained a custom, policy, or practice of deliberate indifference to inmates' serious medical needs." Docket No. 59 at 12. Plaintiff cites paragraphs 77,

82, 83, and 140 of the complaint for this proposition. *Id.* (citing Docket No. 1 at 17-20, 37-38, ¶¶ 77, 82, 83, 140). Paragraph 77 states that El Paso County and Wellpath "maintained constitutionally deficient policies and failed to adequately train and supervise their employees with respect to proper procedures for the evaluation and treatment of CJC detainees' and inmates' serious medical needs." Docket No. 1 at 17, ¶ 77. Paragraph 77 does not allege any other similar incidents of conduct by El Paso County that could support finding an informal custom of deliberate indifference amounting to a widespread practice so permanent and well settled so as to constitute a custom with the force of law. *See Bryson*, 627 F.3d at 788. The Court addresses plaintiff's failure to train argument in the following section.

The portion of paragraph 82 that relates to an El Paso County custom of deliberate indifference alleges that such a custom was shown when each EPSO defendant violated plaintiff's rights by failing to refer him immediately to medical. Docket No. 1 at 18-19, ¶ 82. However, as noted above, the Court has found that no EPSO defendant violated plaintiff's Eighth Amendment rights, and accordingly does not find a custom based on conduct that was not deliberately indifferent.

Paragraph 83 relates to El Paso County and Armor. *Id.* at 20, ¶ 83. As noted above, the Court has not considered the allegations made with respect to Armor because plaintiff brings his claim based on the ultimate harm of a life-threatening MRSA infection and Armor was not providing medical care at the CJC when this happened.

Paragraph 140 states that, "[t]hough Wellpath has only been the medical provider at CJC for a little over a year, Wellpath's and the El Paso County Defendants' custom, policy, or practice of deliberate indifference and their lack of adequate training,

supervision, and discipline regarding assessing and treating the serious medical needs of those in custody at CJC is already in evidence." *Id.* at 37-38, ¶ 140.  This does not allege any other similar incidents of conduct by El Paso County that could support finding an informal custom of deliberate indifference amounting to a widespread practice so permanent and well settled so as to constitute a custom with the force of law.  *See Bryson*, 627 F.3d at 788.

The complaint fails to allege an "informal custom amoun[ting] to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law," *id.*, of deliberate indifference to inmates' serious medical needs by El Paso County.

### 3. Failure to Train

To state a *Monell* claim based on the failure to train or supervise, a plaintiff must sufficiently allege that the failure "amounts to deliberate indifference to the rights of persons with whom the police come into contact."  *City of Canton v. Harris*, 489 U.S. 378, 388 (1989).  However, "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train."  *Connick v. Thompson*, 563 U.S. 51, 61 (2011); *see also Oklahoma City v. Tuttle*, 471 U.S. 808, 822-823 (1985) (plurality opinion) ("[A] 'policy' of 'inadequate training'" is "far more nebulous, and a good deal further removed from the constitutional violation, than was the policy in *Monell*.").

Plaintiff argues that El Paso County is liable under a failure to train theory for the deficient response of Wellpath employees and EPSO defendants.  Docket No. 59 at 10, 12 ("The Complaint further alleges that Armor and Wellpath each failed

to adequately train its personnel."; "the Complaint alleges that the County Defendants failed to properly train and supervise the EPSO Defendants."). Plaintiff cites paragraphs 77, 82, and 205 of the complaint. *Id.* at 12.

These allegations lack any supporting factual allegations providing a basis for plaintiff's failure-to-train theory. Plaintiff does not set forth any facts concerning how EPSO defendants and Wellpath employees were trained, who trained them, or why their training was deficient. *See, e.g., Sexton v. City of Colorado Springs*, 530 F. Supp. 3d 1044, 1072 (D. Colo. 2021) (finding the plaintiff's failure-to-train allegations insufficient where the plaintiff did not provide allegations about how the officers were trained and who trained them); *Erickson v. City of Lakewood, Colo.*, 489 F. Supp. 3d 1192, 1208 (D. Colo. 2020) (dismissing *Monell* claim for failure to allege specific facts regarding the officers' training, did not identify individuals that allegedly failed to adequately supervise or train, and did not contain allegations establishing a pattern of similar conduct); *Est. of Lobato by & through Montoya v. Correct Care Sols.*, *LLC*, No. 15-cv-02718-PAB-STV, 2017 WL 1197295, at *7 (D. Colo. Mar. 31, 2017) ("Notice of particular deficiencies in a training program is the crux of a failure-to-train theory."); *Bark v. Chacon*, No. 10-cv-01570-WYD-MJW, 2011 WL 1884691, at *3 (D. Colo. May 18, 2011) (dismissing municipal liability claim where plaintiff had "generally allege[d]" that the individual defendants were not properly trained but had not "allege[d] specific deficiencies in training and supervision, or explain[ed] how the incident described in the Amended Complaint could have been avoided with different or better training and supervision"). The Court finds that plaintiff has not alleged a failure to train theory that supports municipal liability.

28

#### 4.  Ratification

The complaint makes three conclusory assertions regarding ratification.  *See* Docket No. 1 at 37, 45, 51, ¶¶ 139, 179, 211 ("Armor also ratified the unconstitutional conduct of its employees and agents with respect to the mistreatment of Mr. Plutt. Armor tacitly condoned these deficient actions by failing to adequately investigate what happened and failing to discipline the responsible healthcare workers."; "Wellpath also ratified the unconstitutional conduct of its employees and agents with respect to the mistreatment of Mr. Plutt.  Wellpath tacitly condoned these deficient actions by failing to adequately investigate what happened and failing to discipline the responsible healthcare workers."; "The Entity Defendants ratified the unconstitutional conduct of their employees, agents, and/or subcontractors with regard to the unconstitutional conduct visited upon Plaintiff, as they approved of the conduct and the basis for it."). Plaintiff's response to the motion to dismiss makes no argument regarding ratification. *See generally* Docket No. 59.

In order to state a claim under a ratification theory of municipal liability, the complaint must "allege [] facts regarding an affirmative approval of [the officer's] actions."  *Twitchell v. Hutton*, No. 10-cv-01939-WYD-KMT, 2011 WL 318827, at *5 (D. Colo. Jan. 28, 2011) (citing *Brammer–Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1189 (10th Cir. 2010)); *Bryson*, 627 F.3d at 790 ("[A] municipality will not be found liable under a ratification theory unless a final decisionmaker ratifies an employee's specific unconstitutional actions, as well as the basis for these actions.").

Plaintiff's conclusory allegations do not meet this standard.  Additionally, "a mere failure to discipline does not constitute ratification."  *Hernandez v. City and Cnty. of*

*Denver*, No. 21-cv-01538-PAB-MEH, 2022 WL 3597452, at *8 (D. Colo. Aug. 23, 2022) (collecting cases).  Accordingly, to the extent plaintiff advances a ratification theory, the Court rejects it.

### 5. Conclusion

The Court finds that plaintiff's complaint does not allege an Eighth Amendment violation by El Paso County.  Accordingly, the Court will grant El Paso County's motion to dismiss claim three.[9]

### C.  Claims Four and Five

In claims four and five, plaintiff alleges violations of Title II of the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act of 1973.  Docket No. 1 at 52-55, ¶¶ 217-32.  The County defendants move to dismiss these claims, arguing that the "lone paragraph" pertaining to these allegations in the complaint "should be insufficient to establish deliberate indifference even if it is coupled with the Complaint's other formulaic recitations of the elements of these claims."  Docket No. 48 at 14-15.

---

[9] Defendants Wellpath, Amanda Hutchinson, Hunter Grant, and Robert Pero ("Wellpath defendants") filed a joinder of the County defendants' motion to dismiss over six months after the filing of the motion to dismiss.  *See* Docket No. 85.  The Wellpath defendants already filed an answer to the complaint.  *See* Docket No. 39.  Plaintiff opposes this joinder.  Docket No. 86.  Wellpath defendants filed a reply in support of their joinder, arguing that the Court should construe it as a motion for judgment on the pleadings under Rule 12(c).  Docket No. 87 at 2-3.  Wellpath defendants did not make this argument in their "joinder," the joinder is not a motion, and the Court does not condone this ill-executed attempt to rectify a strategic error.  However, the Court has considered the issue raised – whether Wellpath had an informal custom amounting to widespread practice of delaying or declining to send inmates to receive outside medical care – and found that the complaint does not allege such a custom.  Accordingly, the Court will dismiss claim three with respect to Wellpath.

This is the extent of the County defendants' argument.  Their reply is similarly brief.  *See* Docket No. 62 at 10.

The County defendants are the party moving for dismissal.  Their briefing on the issue is insufficient to warrant dismissal of claims four and five, and the Court accordingly will deny this portion of the motion.[10]  *See United States v. Wooten*, 377 F.3d 1134, 1145 (10th Cir. 2004) ("The court will not consider . . . issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation.").

## IV.  CONCLUSION

It is therefore

**ORDERED** that the County Defendants' Motion to Dismiss [Docket No. 48] is **GRANTED in part** and **DENIED in part**.  It is further

**ORDERED** that claim two is dismissed.  It is further

**ORDERED** that claim three is dismissed with respect to El Paso County and Wellpath.

DATED September 28, 2022.

BY THE COURT:

PHILIP A. BRIMMER
Chief United States District Judge

_____

[10] On July 14, 2022, the County defendants filed a notice of supplemental authority, citing *Cummings v. Premier Rehab Keller, P.L.L.C.*, 142 S. Ct. 1562 (2022). Docket No. 71.  *Cummings* concerned damages under the Rehabilitation Act.  *Id.*  This supplemental authority does not cure the deficient argumentation by the County defendants and is accordingly irrelevant to the Court's conclusion.